Louis A. Gentile et al. v. Paul B. Altermatt [Thomas C. White, Substituted Defendant] et al.

House, C. J., Loiselle, MacDonald, Bogdanski and Longo, Js.

268

Argued April 9—decision released August 5, 1975

*Harold J. Geragosian,* with whom were *Timothy Sheehan* and *Mitchell Gardner,* for the plaintiffs.

*Barney Lapp,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the named defendant et al.

*Ralph G. Elliot,* with whom was *William H. Champlin III,* for the defendants Aetna Casualty and Surety Company et al.

MacDonald, J. This declaratory judgment action was brought by the plaintiffs seeking a declaration that 1972 Public Acts, No. 273, now codified in chapter 690 of the General Statutes as §§ 38-319 through 38-351a and subsequently amended, is unconstitutional. The plaintiffs are Connecticut residents, taxpayers and private passenger motor vehicle owners required by the act to maintain security on their vehicles, three of whom, Rosemary Boyajian, Stilianos Karidas and Katherine Pagonis, sustained, in private passenger motor vehicle accidents subsequent to the effective date of the act, injuries which did not result in death, permanent injury, fracture of any bone, permanent significant disfigurement, permanent loss of any bodily function, or allowable expense, as that term is defined by the act, in excess of $400.

The defendant state officials are the insurance commissioner, the treasurer, the comptroller and the commissioner of finance and control. The intervening defendants are eight domestic and foreign insurance companies which write automobile liability insurance on private passenger motor vehicles in the state of Connecticut. All of the defendant insurance companies are also members of the Connecticut automobile insurance plan, an assigned risk plan maintained by authority of law.

Notice of the pendency of this action was given pursuant to an order of notice dated January 11,

1973. The second amended complaint in this action was dated February 22, 1973, and was answered by the defendants on July 10 and July 11, 1974. The Court of Common Pleas *(Missal, J.)* on July 8, 1974, found that all persons having an interest in the subject matter of the complaint had received reasonable notice thereof.

On July 11, 1974, the parties executed a stipulation of fact and posed certain questions of law for which they sought by reservation the advice of this court. The stipulation contains a complete statement of the facts, including the exhibits and documents necessary for resolution of the questions propounded by the parties. On July 12, 1974, at the request of and with the consent of all the parties, the court *(Missal, J.)* reserved the questions listed in the stipulation for the consideration and advice of this court.

The no–fault motor vehicle insurance act, hereinafter the act, passed by the General Assembly on April 18, 1972, and signed by the governor, constitutes a thorough reform of the automobile accident compensation system in Connecticut. Justification for passage of the act is based upon legislative hearings, and the findings of the special Connecticut study commission, the United States Department of Transportation Automobile Insurance and Compensation Study, and the testimony of numerous witnesses at public hearings. Briefly summarized, the act requires that owners of private passenger motor vehicles in Connecticut and certain other persons provide security for the payment of basic reparations benefits and for residual liability. Basic reparations benefits are provided, without regard to fault, to the basic reparations insured for personal

injuries and economic loss suffered as a result of automobile accidents. In consideration of the payment of first party benefits under the act, civil actions may be maintained to recover for noneconomic detriment owing to automobile accidents involving private passenger motor vehicles only when the insured suffers death, permanent injury, fracture of any bone, permanent significant disfigurement, permanent loss of any bodily function or allowable expense in excess of $400.

The plaintiffs assert broadly and extensively that in various respects the act is unconstitutional under the federal and state constitutions. They challenge specifically the requirement that they maintain basic reparations security and the restrictions imposed by the act on the allowance of civil actions to recover for noneconomic detriment and economic loss suffered as a result of private passenger motor vehicle accidents.

We find that there are actual bona fide and significant questions in dispute between the parties and a substantial uncertainty as to the legal relationships arising out of the facts stated herein and that the resolution of these questions involves matters of public interest and major importance to the parties and to the people of the state of Connecticut.

## I

### SYNOPSIS OF ACT

Because of the complexity of the issues involved, each prong of the plaintiffs' multitined attack upon the constitutionality of the act will be treated separately. As a prologue to an analysis of the questions posed, and in the interests of clarity, the following is a synopsis, section by section, of the salient portions of the act:

Section 38-319. Definition of Terms.

"Basic reparations insured." Refers to those persons entitled to coverage under a policy covering an owner of a private passenger motor vehicle required to be insured.

"Economic loss." Means loss consisting of medical and hospital expenses, lost income from work, and, if death is involved, funeral expenses up to $2000 and survivor's loss. Medical expense coverage is broad and includes items such as rehabilitation, nursing services, laboratory fees and drugs, and ambulance services. Work loss includes expenses for substitute household services. Survivor's loss means loss of support suffered by dependents after the death of an injured person.

"Non-economic detriment." Means pain, suffering, inconvenience, physical impairment and mental anguish.

"Allowable expense." Means reasonable charges incurred whether or not covered by insurance for reasonably needed products, services and accommodations.

"Private passenger motor vehicle." Means a private passenger, station wagon or camper type automobile (other than a motorcycle) not used as a public or livery conveyance, or an automobile of the truck type with a load capacity of not more than 1500 pounds not used for commercial purposes other than farming.

Section 38-320. Liability of Owner's Insurer for Basic Reparations Benefits. Outlines the coverage provided by the act. The benefits are called "basic reparations benefits" and consist of a uniform, separately identifiable coverage in every automobile

policy of $5000 per person per accident for economic loss resulting from injury arising out of the use of an automobile. The section provides that benefits of up to $5000 per person are payable to an injured person or, in case of death, to his survivors. This section also provides that benefits for work loss shall not exceed 85 percent of the value of work loss and that benefits for work loss and survivor's loss shall not exceed $200 per week.

Section 38-321. Payees of Basic Reparations Benefits. Defines the circumstances under which basic reparations benefits will be payable to covered persons. It provides for payment to an owner of a private passenger motor vehicle and his relatives injured while occupying a private passenger motor vehicle or while a pedestrian anywhere in the United States, its territories and possessions, or Canada. It also provides for payment to any other person injured while occupying the owner's car anywhere or while a pedestrian struck by the owner's car in Connecticut.

Section 38-323. When Cause of Action Allowable. Establishes the "threshold" for negligence actions. It provides that an injured person entitled to basic reparations benefits can sue an insured owner for negligence arising out of the use of a private passenger automobile only if the injured person has suffered (1) death, (2) permanent injury, (3) fracture of any bone, (4) permanent significant disfigurement, (5) permanent loss of any bodily function, (6) loss of a body member or (7) medical expenses in excess of $400. Persons receiving free medical, hospital or surgical care are entitled to sue if the reasonable value of such care exceeds $400.

Section 38-325. Subrogation. Concerns reimbursement and subrogation rights of insurers. This section provides that an insurer which has paid basic reparations benefits to an injured person is entitled to reimbursement if the injured person is successful in recovering damages in a negligence suit against another insured owner.

Section 38-326. Residual Liability Insurance. Defines residual liability insurance as being, in essence, the traditional third party bodily injury and property damage liability insurance for accidents occurring in the United States, its territories and possessions, or Canada. This liability insurance must comply with the financial responsibility minimums.

Section 38-327. Mandatory Security Requirements (as amended by Public Act No. 74-13). Concerns required coverages. The owner of a private passenger motor vehicle required to be registered in Connecticut is required to provide security for the payment of basic reparations benefits and residual liability insurance. The owner of a private passenger motor vehicle not required to be registered in this state must provide the same security for accidents occurring in Connecticut. Security may be provided by an insurance policy or through various methods of self-insurance.

Section 38-328. Policies Deemed to Provide Required Coverage. Provides that every insurance company authorized to transact the business of motor vehicle liability insurance in Connecticut must declare to the insurance commissioner that its policies provide the security required by this act.

Section 38-329. Property Damage Not Included. Specifies that basic reparations benefits do not include property damage.

Section 38-330. Optional Reparations Coverage. Permits the sale of optional added reparations coverages to persons desiring, for example, more than $200 per week coverage for work loss and survivor's loss, or more than $2000 coverage for funeral expenses. The insurance commissioner may require companies to offer specific optional added reparations coverages.

Section 38-333. Payment as Economic Loss Accrues. Provides that benefits are overdue if not paid within fifteen working days after receipt of reasonable proof of the fact and amount of loss realized, except that an insurer may accumulate claims under $100 for up to thirty days. Overdue payments bear 12 percent annual interest. Any amount paid through workmen's compensation is deducted from basic reparations benefits payable for economic loss.

Section 38-334. Award of Attorney's Fees. Permits a court to award the insured's attorney a reasonable attorney's fee for advising a client seeking overdue benefits, or for defending any action brought by an insurer.

Section 38-335. Civil Action for Benefits. Provides a two-year Statute of Limitations for actions to recover benefits payable under the act.

Section 38-336. Benefits Exempt from Garnishment. Provides that basic and added reparations benefits are exempt from garnishment, attachment, execution and other such claims, except court orders of support, to the same extent that wages are exempt under present law.

Section 38-337. Insurer's Liability for Rehabilitation Treatment or Training. Provides that an insurer is responsible, subject to no-fault coverage limits, for reasonable costs of rehabilitation or rehabilitative occupational training, and provides for appropriate court action if necessary to adjudicate a claim.

Section 38-338. When Benefits Available through Assigned Claims Plan. Outlines the circumstances under which a claim for benefits may be made through the assigned claims plan. Covered under this section would be a non-car-owning person, injured in Connecticut, who is not otherwise entitled to benefits. Provides for subrogation by an assigned claims insurer as against the person or company who initially failed to provide the required benefits.

Section 38-339. Assigned Claims Bureau and Plan. Authorizes insurance companies and self-insurers to establish an assigned claims plan.

Section 38-341. Assigned Risk Plan. Requires that the present assigned risk plan will make basic reparations benefits and residual liability insurance available to all applicants who are in good faith entitled to insurance but are unable to purchase it through ordinary methods.

Section 38-342. Submission of Data to Commissioner. Requires companies to submit rates and rating plans for mandatory insurance to the insurance commissioner individually and not through any rating organization. Further provides that the commissioner shall promulgate a common, uniform statistical plan for claims and loss experience data concerning basic and added reparations benefits.

Section 38-343. Rate Making. Provides standards for establishment of rates for insurance which is mandatory under this act, including the requirement that rates shall not be excessive, inadequate or unfairly discriminatory.

Section 38-344. Insurer to File Certain Information. Requires insurers to file with the insurance commissioner their rates for mandatory coverages at least fifteen days before the rates are to become effective. This fifteen day waiting period may be extended by the commissioner for an additional thirty days. Filings shall be open to public inspection after they become effective.

Section 38-345. Disapproval of Filing. Provides for the insurance commissioner to disapprove filings which he finds do not meet the requirements of this act and to prevent such filings from becoming effective.

Section 38-346. Form of Policy or Endorsement to be Filed. Requires the form for policies providing mandatory coverages to be filed with the insurance commissioner, who may disapprove any policy that is not in accordance with the provisions of this act.

Section 38-347. Insurer to Provide Insured with Rate Information. Requires each insurer which makes its own rates to furnish any insured, upon written request and payment of such reasonable charge as it may make, all pertinent information as to any rate affecting such insured. Also provides a hearing and appeal to the insurance commissioner.

Section 38-348. Penalty. Provides a maximum fine of $1000 for violation of any provisions of the act. Authorizes the insurance commissioner to sus-

pend the license of any insurer which fails to comply with an order of the commissioner. Requires a hearing before a license may be suspended or revoked.

Section 38-349. Hearings on Orders of the Commissioner. Appeals. Provides a hearing procedure for any insurer aggrieved by any order or decision of the insurance commissioner made without a hearing. Provides that any order or decision of the commissioner shall be subject to a review of facts and law by an appeal to the Court of Common Pleas in Hartford County.

Section 38-350. Conflict with Chapters 246, 247, 248. Provides that in the event of any conflict between the provisions of this act and the provisions of the presently existing statutes concerning motor vehicles, the latter shall prevail.

Section 38-351. Rate Reductions. Requires a 10 percent reduction in rates for coverages affected by this act, and directs the insurance commissioner to determine and order further such rate reductions commensurate with rating experience in accordance with §§ 38-343 to 38-349, inclusive, of this act.

Section 38-351a. Declaratory Judgment Action to Determine Constitutionality. Authorizes any Connecticut resident to bring an action for a declaratory judgment to determine the constitutionality of this act.

Section 14-112. Proof of Financial Responsibility. Authorizes the commissioner of motor vehicles to require proof of financial responsibility from any person who has failed to provide the security required by this act, and to suspend or revoke the license and registration of any such person until such proof is furnished.

Public Acts 1972, No. 273, § 36. Provides that §§ 38-319, 38-339, 38-341, 38-342 to 38-349 inclusive, 38-350 and 38-351a of this act shall take effect upon passage. All other sections shall take effect January 1, 1973.

## II

### JURISDICTION

The case under consideration might be termed a jurisdictional hybrid, having followed a rather circuitous path to reach this court. Section 38-351a, printed in full in the footnote,[1] represents an attempt by the legislature to seek this court's opinion prior to the effective date of the act on the various foreseeable constitutional questions that almost inevitably would arise upon its implementation. That portion of the act to which these questions apply was effective January 1, 1973. However, § 38-351a was effective May 19, 1972, the date of its approval, and by this provision the legislature sought to eliminate what it foresaw as the principal causes of procedural delay in achieving a prompt judgment from this court. The unfortunate effect

---

[1] "[General Statutes] Sec. 38-351a. DECLARATORY JUDGMENT ACTION TO DETERMINE CONSTITUTIONALITY. The general assembly finds and declares that a grave question of law exists with respect to the constitutionality of some of the sections of this chapter, similar provisions having been declared unconstitutional in another state, and that the public welfare requires that such question with respect to this chapter be resolved with expedition prior to such time as the mandatory provisions hereof shall take effect in order to avoid disruption of the orderly implementation of said provisions. The supreme court of this state has held (114 Conn. 297, 301; 145 Conn. 570, 575) that the remedy by means of declaratory judgment, available under section 52-29, is highly remedial, that the statute and rules should be accorded a liberal construction to carry out the purposes underlying such judgments, one great purpose being to enable parties to have their differences authoritatively settled in advance of any claimed invasion of rights, and that the provision that there

of this section in its actual application was to color with uncertainty some of the acts of the parties performed in perfecting the present reservation.

To avoid procedural impediments to a full and final determination of all of the issues presented, the parties agreed upon a course that, in their determination, satisfied our traditional procedures for such actions, as well as the requisites of § 38-351a. The action was begun, as intended by the legislature, prior to the effective date of the challenged provisions; however, the complexity of the various issues and the enormous and far-reaching consequences of any judicial resolution, of necessity affecting a significant class of potential parties, mandated a very deliberate, thorough notice process to define the necessary parties and to ensure their opportunity to participate. Thus, more than two years subsequent to the effective dates of the complete act, the case finally has reached the threshold of resolution.

The plaintiffs have raised some questions with respect to which their standing is uncertain, but the

be an issue in dispute requiring settlement between parties means no more than that there must appear a sufficient practical need for the determination thereof. Therefore, the general assembly finds that the remedy of declaratory judgment to determine the constitutionality of the provisions of this chapter should be immediately made available to determine that important question, in order to avoid utter confusion by the public in the event this chapter is declared unconstitutional after January 1, 1973. Therefore, any resident of the state is authorized to forthwith bring an action for a declaratory judgment in the superior court, or the court of common pleas for Hartford county, against the insurance commissioner of the state to determine the constitutionality of said provisions. Such court shall reserve the questions of law for the advice of the supreme court as provided in section 52-275 and section 738 and 739 of the Connecticut Practice Book. In the interest of expediting a decision, the supreme court may suspend its rules as provided in section 762 of the Connecticut Practice Book."

parties have urged that we exercise our discretion and consider all issues raised in this action. We adhere to our rule that where, as here, the plaintiffs have standing to raise certain issues pertaining to the controversy, this court, in matters of significant public moment where the public interest would best be served by a dispersal of all constitutional clouds over the act in question, will exercise that discretion and decide all closely related issues. *Heiberger* v. *Clark,* 148 Conn. 177, 184, 169 A.2d 652; *West* v. *Egan,* 142 Conn. 437, 441, 115 A.2d 322; *Ruppert* v. *Liquor Control Commission,* 138 Conn. 669, 673, 88 A.2d 388. The parties have meticulously respected the bounds of propriety in developing the class of plaintiffs and defendants actually involved, and we find that further efforts to join all of those who have standing to raise each of the remaining few particular issues for which the present parties' standing may be challenged might well border on barratry. The interests of the plaintiffs are unquestionably adverse to those of the defendants and, further, their interest in nearly all aspects of this controversy is sufficient to guarantee a true and complete adversary presentation of all the questions discussed in the briefs.

Numerous specific questions are propounded in the stipulation for reservation; the parties, however, centered their attention on certain major issues, leaving others unmentioned in their briefs. The exercise of our discretion to waive the standing requirements for each issue cannot be extended to allow us to treat those issues not briefed. Rather than answer each question as propounded in the stipulation, we have chosen to follow the format suggested by the briefs and will discuss the issues as they were therein raised and argued.

## III

### NATURE OF CONSTITUTIONAL RIGHTS INVOLVED

The portion of the act to which the strongest objections are addressed is that which limits an injured party's cause of action, based upon the claimed fault of another, for the recovery of general and special damages. The challenge to § 38-323,[2] initially, is grounded upon provisions of our state constitution, and thereafter and in addition thereto, upon provisions of the federal constitution.

Article first, § 10, of the Connecticut constitution (formerly article first, § 12) provides that "[a]ll courts shall be open, and every person, for an injury done to him in his person, property or reputation,

---

[2] Because of its revolutionary impact upon our jurisprudence § 38-323 is printed in full.

"[General Statutes] Sec. 38-323. CAUSE OF ACTION ALLOWABLE, WHEN. (a) No cause of action to recover economic loss or non-economic detriment based on negligence arising out of the ownership, maintenance or use of a private passenger motor vehicle may be maintained against an owner, registrant, operator or occupant of a private passenger motor vehicle with respect to which security has been provided as required by this chapter, or against any person or organization legally responsible for his acts or omissions, unless the injured party has sustained (1) death, (2) permanent injury, (3) fracture of any bone, (4) permanent significant disfigurement, (5) permanent loss of any bodily function, (6) loss of a body member or (7) allowable expense as defined in section 38-319 in excess of four hundred dollars. Any person who receives free medical, hospitalization and surgical care shall be deemed to meet the requirement of subdivision (7) if the reasonable value of such care exceeds four hundred dollars.

(b) The exemption under subsection (a) of a person from liability to pay damages for injury applies only with respect to injury to (1) owners of private passenger motor vehicles with respect to which security is required under this chapter, (2) persons entitled to basic reparations benefits from any such owner or his insurer or through the assigned claims plan, and (3) persons who would be entitled to such benefits but for section 38-331 or 38-332."

shall have remedy by due course of law, and right
and justice administered without sale, denial or
delay." This provision appears in the constitution
of 1818 and in its several revisions and reenact-
ments, and has been referred to as the right to
redress. *State* v. *Perkins*, 88 Conn. 360, 368, 91 A.
265. Its importance in this dispute is illustrated
by the following language from *Munn* v. *Illinois*, 94
U.S. 113, 134, 24 L. Ed. 77: "A person has no prop-
erty, no vested interest, in any rule of the common
law. That is only one of the forms of municipal law,
and is no more sacred than any other. Rights of
property which have been created by the common
law cannot be taken away without due process; but
the law itself, as a rule of conduct, may be changed
at the will, or even at the whim, of the legisla-
ture, *unless prevented by constitutional limitations.*
Indeed, the great office of statutes is to remedy
defects in the common law as they are developed,
and to adapt it to the changes of time and circum-
stances." (Emphasis added.)

The plaintiffs essentially contend that article first,
§ 10, restricts the power of the legislature to abolish
a cause of action recognized at common law. They
refer to the right to bring an action in tort to re-
cover damages as a common-law right, but their
analysis is incomplete. Clearly, if the nature of this
right to sue is, in its fullest extent, a common-law
right, then, with a possible limitation to be discussed
shortly, the power of the legislature to abolish such
a right is fundamental. If this right to sue, however,
is a constitutional right, it is equally clear that the
power of the legislature to abrogate it is curtailed
by article first, § 10. There being no statutory right
herein applicable, there remain three classes into
one of which this right to sue in tort for damages

from automobile mishaps must fall: (1) common-law right, (2) constitutional right, or (3) constitutionally incorporated common-law right. Some discussion of (1) and (2) is necessary before we consider (3), which we have referred to as a constitutionally incorporated common-law right.

Early in the development of our system of jurisprudence we adopted from the English common law the action of trespass on the case. 2 Swift, System of the Laws of the State of Connecticut, p. 29. As stated by Zephaniah Swift in 1796, "if any damage is caused to another, for the want of due care and attention, or by the folly of the defendant, this action [trespass on the case] lies." Id., 108. An action sounding in negligence for damages for personal injuries sustained in an automobile mishap is one modern manifestation of this ancient cause of action. Wright & Fitzgerald, Connecticut Law of Torts, § 4, p. 6. In its early form, it predates our constitution of 1818, and it is no great labor of logic to conclude that the framers of the constitution intended that our courts be available for redress of this type of injury. If viewed as a limitation on the right to redress for an injury caused by negligence, the restriction under consideration stands contrary to the mandate of article first, § 10, and thus must fall. Section 38-323, however, does not restrict the right to redress for an actionable injury but, rather, redefines the injury or the class of persons injured to which this constitutional right of redress attaches. What is of constitutional dimensions, then, is the right of redress and not the nature of the particular injury for which redress is sought. Stated differently, the right to redress in the courts must remain inviolate but it does not attach unless one suffers a recognized injury.

To quote once again the language used by Swift almost 200 years ago: "A wrong or injury is defined to be a deprivation, or infringement of right." In *Taylor* v. *Keefe,* 134 Conn. 156, 163, 56 A.2d 768, we defined "injury" as the term is used in article first, § 10 (then article first, § 12) to mean "a legal injury, that is, one violative of established law of which a court can properly take cognizance." Support for this construction was found in the courts of Montana and Pennsylvania, states having like constitutional provisions. See *Stewart* v. *Standard Publishing Co.,* 102 Mont. 43, 49, 55 P.2d 694; *Jackman* v. *Rosenbaum Co.,* 263 Pa. 158, 168, 106 A. 238. The rule has been further modified in *Benson* v. *Housing Authority,* 145 Conn. 196, 201–2, 140 A.2d 320, to the effect that an injury is not compensable absent recognition of that injury either by our courts or by specific statutory provision. Thus refined, the phrase "established law" within the definition of "injury" encompasses legislative law as well as judge-made law. See *Lockwood* v. *Wilson H. Lee Co.,* 144 Conn. 155, 159, 128 A.2d 330.

Viewing injury, then, as the violation of a right established by law, we conclude that it is within the province of the legislature to redefine or abolish existing definitions of injury since it is within its province to create, abrogate or redefine the "established law." *Munn* v. *Illinois,* supra. Thus the right of redress for injury is constitutional in its nature but the nature of a specific injury is a right derived from the common law or statute. Insofar as § 38-323 merely redefines injury it does not infringe upon the right to redress. As this court stated in *Pierce* v. *Albanese,* 144 Conn. 241, 250–51, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21, upholding the constitutionality of Connect-

icut's dram shop statute: "The legislature in the exercise of its police power can alter or abolish accepted principles of common-law liability to pay compensation for injuries without violating constitutional mandates."

We move then to a consideration of the third of the categories into which must fall this right to sue in tort for damages from automobile mishaps which we have termed the hybrid "constitutionally incorporated common-law right." The limitation previously referred to upon the legislature's ability to abolish common-law rights arises from the incorporation of those rights into our constitution by virtue of the adoption of article first, § 10 (formerly article first, § 12). Simply stated, all rights derived by statute and the common law extant at the time of the adoption of article first, § 10, are incorporated in that provision by virtue of being established by law as rights the breach of which precipitates a recognized injury, thus being exalted beyond the status of common-law or statutory rights of the type created subsequent to the adoption of that provision. *Kluger* v. *White,* 281 So. 2d 1, 4–5 (Fla.); 16A C.J.S., Constitutional Law, § 710, pp. 1218–19; Ruben & Williams, The Constitutionality of Basic Protection, 1 Conn. L. Rev. 44, 46 n.13, and cases cited therein.

The adoption of article first, § 10, recognized all existing rights and removed from the power of the legislature the authority to abolish those rights in their entirety. Rather, the legislature retains the power to provide reasonable alternatives to the enforcement of such rights. Where such reasonable alternatives are created, the legislature may then restrict or abolish the incorporated common-law or statutory rights. *Kluger* v. *White,* supra; Ruben &

Williams, supra. The defendants have argued that injury from the negligent operation of an automobile is a creature of the twentieth century and thus could not have been contemplated as an incorporable common-law right by the framers of the constitution of 1818. The argument is appealing but fails to recognize the jurisprudential underpinnings of the automobile negligence personal injury cause of action, which we noted earlier to be trespass on the case. Thus the classical theory upon which recovery is based in such actions was redressable under our first constitution, and the automobile negligence injury, being a specific modern manifestation of this theory, is well vested in our "established law" and therefore within the so-called hybrid status.

Having thus concluded that the right to recover for injury from automobile negligence is a hybrid common-law right within the third of the three defined classes, we must next consider whether the legislatively created remedy by which it is in part replaced is a reasonable alternative. *Mountain Timber Co.* v. *Washington,* 243 U.S. 219, 240–41, 37 S. Ct. 260, 61 L. Ed. 685; *New York Central R. Co.* v. *White,* 243 U.S. 188, 201, 37 S. Ct. 247, 61 L. Ed. 667; *Kluger* v. *White,* 281 So. 2d 1, 4–5 (Fla.); *Pinnick* v. *Cleary,* 360 Mass. 1, 15, 271 N.E.2d 592.

## IV

### REASONABLE ALTERNATIVE

The question as to whether the legislatively created remedy is a reasonable alternative is best decided by viewing in the aggregate the remedies which the act provides. The question of no-fault automobile insurance has been studied on federal and state, private and public levels for several years and, without abrogating our judicial function, it

seems appropriate to discuss at least some of the policy arguments that precipitated the passage of the act.

Enactment of the Connecticut no-fault insurance act resulted from the historical confluence of popular disaffection with the inadequacies of the automobile accident compensation system based on fault, the availability of empirical data from systematic studies of alternative automobile accident reparations systems, and the willingness of the legislature to respond to the popular will. Public awareness of the deficiencies and inequities of the tort liability system for the compensation of victims of motor vehicle accidents was heightened and encouraged by the publication in 1965 of a study entitled "Basic Protection for the Traffic Victim" by Professors Robert E. Keeton and Jeffrey O'Connell. This detailed work identified weaknesses and inefficiencies inherent in an automobile reparations system based on fault.

In May, 1968, the Congress of the United States in Public Law 90-313 directed the secretary of transportation of the United States to investigate the motor vehicle accident compensation system and to report to the Congress his findings, conclusions and recommendations for legislation. Pursuant to this congressional mandate, the secretary of transportation and his successor conducted an exhaustive study, using resources of the department and numerous nongovernmental experts retained to contribute to the study. The ultimate findings of the department of transportation study, hereinafter DOT study, were that the states should strive toward: a system of no-fault insurance (1) based on universal compulsory first party insurance coverage

serviced by private insurance companies and providing protection for all motor vehicle owners by covering all economic losses above voluntarily accepted deductibles up to reasonably high limits; (2) coupled with restrictions on the availability of resort to litigation by motor vehicle accident victims for economic losses or for intangible losses except in truly serious cases. DOT study, supra.

Contemporaneously with the publication of the DOT study, the need to investigate the inadequacy of the existing system for compensation of automobile accident victims in Connecticut led to the enactment of 1971 Special Act No. 143 to establish a committee to undertake a comprehensive study and make recommendations for legislation. The study commission was charged to study and make suggestions regarding automobile accidents, including their prevention and consequences, and related insurance, motor vehicle and procedural laws bearing thereon, and to determine whether such laws, together with the statutory rules of the road, most effectively contribute to the prevention of automobile accidents and the expeditious and adequate financial recourse of automobile accident victims. This commission, after an exhaustive study, recommended that the legislature adopt "an evolutionary approach to improving Connecticut's present tort liability system to the end that a greater number of injured persons will receive payment for their injuries and damages by mandatory first party payments to be made without regard to fault." The commission further suggested that suits for pain and suffering be abolished except in circumstances involving death, serious injury as defined by the commission report, or economic loss above a threshold. Substitution of the first party benefits

for the tort remedy was necessary to pay for the additional first party coverages recommended and to obtain the dollar premium savings which the public expected.

Upon receipt of the study commission's report, the General Assembly in 1972 began consideration of a no-fault insurance bill. Substitute House Bill No. 5479 entitled "An Act Concerning No-Fault Motor Vehicle Insurance" was the subject of thorough and extensive hearings before the joint judiciary and insurance and real estate committee of the General Assembly in April of 1972. The joint committee also received a detailed cost-benefits analysis of no-fault insurance from a consumer viewpoint estimating the likely savings in insurance premiums to be obtained through the use of a no-fault insurance system, prepared at the request of the study commission and joint committee by Neill W. Portermain, an actuarial consultant. Portermain analyzed the effect of the legislature's modification of the threshold from $750 in total economic loss recommended by the commission to the $400 in medical expenses ultimately incorporated into the act. This modification necessitated a total recosting of the plan by Portermain; and his April 3, 1972 testimony before the joint committee was thus a further clarification and refinement of the study which he had previously conducted. His conclusion was that the grading of the threshold to $400 in medical expenses would produce a cost analysis very close to the one which he had originally conducted based on a $750 total economic loss threshold. It is readily apparent that the study commission and the joint committee were concerned with guaranteeing the prompt payment of benefits to injured parties while at the same time achieving a reduction in insurance

premiums and an increase in efficiency in the reparations system. The General Assembly, after lengthy debate concerning all the materials and studies hereinbefore discussed and the policy considerations concerning and surrounding no-fault legislation, passed Substitute House Bill No. 5479 on April 18, 1972. The act was signed and approved by the governor on May 19, 1972.

Even a brief perusal of the thirty-six sections of the act demonstrates clearly that it is a legitimate legislative response to the specific causes of public discontent and disaffection with the motor vehicle accident compensation system based on fault. Sections 38-320—38-322 provide first party compensation, enabling an injured party to obtain prompt recompense for his most serious financial needs without bearing the expense and lengthy delay associated with litigation to establish fault. Furthermore, the benefits provided by this first party coverage are disbursed immediately following the accrual of the loss. Section 38-337 appears to be a specific response to the findings of the department of transportation study on the rehabilitation of automobile accident victims. DOT study, "Rehabilitation of Auto Accident Victims." The basic reparations insurer is responsible for the cost of a procedure or treatment of rehabilitation when the program of rehabilitation is reasonable, its cost is reasonable, and there is a reasonable likelihood that the program will contribute to rehabilitation, even if it will not enhance the injured person's earning capacity.

Section 38-323 is an attempt to cure several defects in the fault compensation system as noted by the department of transportation and the study commission. The fault system's reliance on litiga-

tion in minor claims caused administrative inefficiencies which resulted in payment of only forty-four cents of every dollar of premiums as benefits to insured victims, and caused overcompensation of small claims below $500 as well as extreme pressure on court dockets. No cause of action for economic loss or noneconomic detriment based on negligence may be maintained under the act unless the injured person has satisfied the exceptive criteria of § 38-323.

Sections 38-341—38-349 are regulatory measures which provide that the insurance commissioner shall supervise the insurance industry to the end that insurers provide coverage under the act at reasonable rates and that all persons are able to obtain such coverage either through the normal insurance market or through the assigned risk plan. Finally, § 38-351 demonstrates the legislature's awareness of the popular belief that insurance rates were unnecessarily high as a result of the fault system and mandated a reduction in rates of 10 percent, thus passing directly to the consumer the benefits of increased administrative efficiency provided by the no-fault system.

Since, however, it is within the power of the legislature to create reasonable alternative remedies, our review of the act's relation to article first, §10, is limited to the issue of reasonableness and not to whether such an alternative is necessary in the first instance. Opponents of no-fault insurance focus their arguments upon the act's effect on the non-exempted plaintiff (that is, the plaintiff who fails to satisfy any of the exceptive criteria of § 38-323 and thus must accept only the basic reparations offered under the act) and question the substitu-

tion of the act's remedies as to this plaintiff, as an alternative to the prior unrestricted tort cause of action. What is given in return for the disallowance of this cause of action, however, is immediate payment of reasonable medical expenses and economic loss. In comparison, the nonexempted plaintiff forgoes damages for mental anguish, physical impairment, and pain and suffering. The act thus restricts the extent of recovery to injuries of greater magnitude where attendant pain and suffering, in the determination of the legislature in the great majority of cases, will be extensive. Thus the act is a legislative realization that minor injury cases (nonexempted plaintiffs) involve little in the way of noneconomic detriment and that the injured party is better compensated by immediate payment of the act's defined first party benefits.

Standing alone, the nonexempted plaintiff's alternate remedies may not equate with the foregoing tort remedies. It must be recognized, however, that the law requires a reasonable alternative and not an exact equation of remedies. Thus for each remedy or item of damage existing under the prior fault system, it is not required that that item be duplicated under the act but that the bulk of remedies under the act be of such significance that a court is justified in viewing this legislation on the whole as a substitute, the benefits from which are sufficient to tolerate the removal of the prior cause of action. Having thus viewed the act, we are not limited to a consideration merely of its effect upon the nonexempted plaintiff. When one enters upon the highway he or she is, at the same time, a potential plaintiff and a potential defendant. *Pinnick* v. *Cleary*, 360 Mass. 1, 22, 271 N.E.2d 592. We must then add to the benefits accorded the nonexempted

plaintiff the immunity granted by the act to his defendant-counterpart. Therefore, while limiting recovery for the nonexempted plaintiff, the act further assures each insured that when he is placed in the role of tortfeasor he is granted immunity from suit to the extent that his victim is in the nonexempted category. Added to this is the reduced premium for such first party coverage because of the compulsory nature of the act. It is this aggregate of benefits to the insured that clearly falls within the ambit of reasonable alternative. By similar reasoning the Supreme Judicial Court of Massachusetts sustained its no-fault act. *Pinnick* v. *Cleary,* supra. Comparing the effect of the act's remedies to the prior tort system, employing as an analogue the rationale and analysis of *New York Central R. Co.* v. *White,* 243 U.S. 188, 37 S. Ct. 247, 61 L. Ed. 667, which sustained New York's Workmen's Compensation Act as a reasonable substitute for prior common-law tort remedies abrogated by the act, the Massachusetts court stated (p. 23): "The effect of . . . [the no-fault act] on Massachusetts motorists thus is to provide benefits in return for affected rights at least as adequate as those provided to New York employers and employees in return for rights taken by the act in the *White* case."

## V

### EQUAL PROTECTION

The final attack by the plaintiffs on § 38-323 is founded upon the fourteenth amendment to the United States constitution and article first, § 20, of the Connecticut constitution and claims, in essence, that this provision of the act denies the plaintiffs the equal protection of the laws, it being argued that denying nonexempted plaintiffs the cause of action that remains to exempted plaintiffs is an

invidious discrimination. This question has been presented in a number of jurisdictions and resolved, in the majority of cases, in favor of constitutionality. See *Lasky* v. *State Farm Ins. Co.,* 296 So. 2d 9 (Fla.); *Manzanares* v. *Bell,* 214 Kan. 589, 522 P.2d 1291; *Pinnick* v. *Cleary,* 360 Mass. 1, 271 N.E.2d 592; *Opinion of the Justices,* 113 N.H. 205, 304 A.2d 881; see contra, *Grace* v. *Howlett,* 51 Ill. 2d 478, 283 N.E.2d 474; *Montgomery* v. *Daniels,* 81 Misc. 2d 373, 367 N.Y.S.2d 419; see also *Gaines* v. *Mohawk Motor, Inc.,* 43 U.S.L.W. 2074 (Mich. Cir. Ct.).

Given our previous analysis concluding that the act presents a reasonable alternative remedy to the prior fault system for nonexempted plaintiffs, we cannot conclude that the discrimination between the class of exempted and nonexempted plaintiffs is invidious or unreasonable, since each is remedied sufficiently, albeit by different routes. The issue presented is whether this classification or discrimination bears a rational relationship to a legitimate state end and is based on reasons related to the pursuit of that goal. *McDonald* v. *Board of Election Commissioners,* 394 U.S. 802, 808–9, 89 S. Ct. 1404, 22 L. Ed. 2d 739. As the Supreme Court stated in *Reed* v. *Reed,* 404 U.S. 71, 75, 92 S. Ct. 251, 30 L. Ed. 2d 225: "[T]he Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. *Barbier* v. *Connolly,* 113 U.S. 27 [5 S. Ct. 357, 28 L. Ed. 923] (1885); *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61 [31 S. Ct. 337, 55 L. Ed. 369] (1911); *Railway Express Agency* v. *New York,* 336 U.S. 106 [69 S. Ct. 463, 93 L. Ed. 533] (1949); *McDonald* v. *Board of Election Commissioners,* 394 U.S. 802 [89 S. Ct. 1404, 22 L. Ed. 2d 739] (1969). The equal protection clause of that amendment does, however, deny to

States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co.* v. *Virginia,* 253 U.S. 412, 415 [40 S. Ct. 560, 64 L. Ed. 989] (1920)."

Similarly, in Connecticut, we have discussed the constitutional tests relevant to this issue in *Tough* v. *Ives,* 162 Conn. 274, 292–93, 294 A.2d 67: "The legislative act, moreover, may not establish classes that have no reasonable relation to any permissible, public purpose. This does not, of course, prevent the legislature from dealing differently with different classes of people. It means only that classifications must be based on natural and substantial differences, germane to the subject and purpose of the legislation, between those within the class included and those whom it leaves untouched. *Lyman* v. *Adorno* . . . [133 Conn. 511, 521, 52 A.2d 702]; *State* v. *Cullum,* 110 Conn. 291, 295, 147 A. 804." Differences of treatment under law should not be approved when they are based on classifications unrelated to the legislative purpose. *Tough* v. *Ives,* supra, 293.

Justice Holmes, although considered no true friend of the equal protection challenge by virtue of having referred to "equal protection" as the "last resort of constitutional lawyers," [3] once stated:

[3] Cowen, Due Process, Equal Protection and "No-Fault" Allocation of the Costs of Automobile Accidents, in DOT Study, Constitutional Problems in Automobile Accident Compensation Reform, pp. 1, 17.

"[W]hen it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas & Electric Co.* v. *Coleman,* 277 U.S. 32, 41, 48 S. Ct. 423, 72 L. Ed. 770. The legislature, having concluded that compelling public interests in accident reparations would best be served by eliminating the fault concept in minor motor vehicle accidents, established the threshold monetarily at $400. The Portermain actuarial studies of the effect of the $400 threshold and a $750 threshold resulted in the conclusion that the legislature's purpose would be served better by the lower mark. The prior unrestricted system of remedy for accident victims has developed into a forensic Medusa. Those approaching it often stood rock hard facing the inevitable delays and uncertainties inherent in contested trials. The concept of general damages has been lost sight of and, in its place, there has emerged a system of frequent overcompensation for victims with minor injuries, which, in effect, represents the price paid by liability insurers to forgo the long, expensive process of litigation. An unfortunate concomitant of this has been the undercompensation of cases of a truly serious nature. If anything, the act tends to be an equalizer, providing the more seriously injured the opportunity to seek true redress. Certainly, those injured who hover on either side of the $400 threshold may suggest imperfections in this system, in that one who incurs $399.99 in allowable expense fails to satisfy that criterion for exemption, while another incurring $400.01 in expenses is exempted. Yet in every instance where a line must be drawn or a cutoff

established there are those who fall directly on either side. This is but one of the vagaries of life to which we accustom ourselves and which we accept in our daily affairs, but we cannot, for this reason, find the act unreasonable in its purpose and overall effect. We rely, instead, on the thought that no matter to which side of the line a party is placed his remedies are sufficient and reasonable.

## VI

### JURY TRIAL

The plaintiffs argue that article first, § 19 (formerly article first, § 21) which mandates that the right to trial by jury remain inviolate is subverted by § 38-323. The right to trial by jury attaches at the point that one's right to redress vests under article first, § 10. Thus, insofar as the act does not restrict the right to redress, exempted plaintiffs retain their right to a trial by jury. The constitutional prohibition on the abridgement of the jury trial right historically has been interpreted to apply, not in all possible instances, but only in those cases for which the right existed when the constitution was adopted. *La Croix* v. *County Commissioners,* 50 Conn. 321, 327; *Goddard* v. *State,* 12 Conn. 448, 454. Thus as to cases triable to the jury prior to the constitution of 1818, and extant at the time of its adoption, the right may not be abolished. That is to say, for example, that had the legislature provided in the present case that, rather than abolish the cause of action for nonexempted plaintiffs, factual issues in such instances are to be tried to a commissioner or the court without a jury, this would offend article first, § 19. This constitutional prohibition is not concerned, however, with the abolition of or limitation on causes of action, for,

if such were the case, no statute of limitations would pass its scrutiny. Rather, it mandates that, given a recognized cause of action to which the right to trial by jury attached prior to the existing constitution, the right to trial by jury must always be available in the trial of that cause. See *United States Fidelity & Guaranty Co.* v. *Spring Brook Farm Dairy, Inc.,* 135 Conn. 294, 297, 64 A.2d 39; *State* v. *Torello,* 103 Conn. 511, 514, 131 A. 429; *Roy* v. *Moore,* 85 Conn. 159, 167, 82 A. 233.

# VII

## MANDATORY SECURITY

The fact that the act mandates compulsory security and directs that uninsured owners of private passenger vehicles with liability to injured parties under the act post security and provides penal sanctions for failure to carry such security is not offensive to the state or federal constitutions. Since it is within the province of the legislature to create alternative remedies, and since we have found these remedies to be reasonable, it is merely an exercise of the police power to direct that all private passenger vehicle owners carry basic security. The no-fault system continues as a reasonable alternative only if it can assure those who seek to benefit from it or who suffer loss as a result of it (nonexempted plaintiffs) that the system applies uniformly. If substantial numbers of persons are left remediless, such as nonexempted plaintiffs injured while passengers in automobiles owned by persons who fail to carry the basic security, or if the act fails to compensate nonexempt plaintiffs for their full economic loss, it may fail to sustain itself as a reasonable alternative. See *Kluger* v. *White,* 281 So. 2d 1 (Fla.); *Gaines* v. *Mohawk Motor, Inc.,* 43 U.S.L.W. 2074 (Mich. Cir. Ct.).

It is within the police power of the legislature to regulate the use of our highways and, as an incident thereto, the use of vehicles upon the highways; *Silver* v. *Silver,* 108 Conn. 371, 377, 143 A. 240, aff'd, 280 U.S. 117, 50 S. Ct. 57, 74 L. Ed. 221. There we approved of the so-called guest statute as a reasonable act by the legislature within this regulatory power, and the affirming opinion by the United States Supreme Court contains language that may be adapted to the present controversy: "Whether there has been a serious increase in the evils of vexatious litigation in this class of cases, where the carriage is by automobile, is for legislative determination and, if found, may well be the basis of legislative action further restricting the liability. Its wisdom is not the concern of courts." *Silver* v. *Silver,* 280 U.S. 117, 123, 50 S. Ct. 57, 74 L. Ed. 221. And the fact that the provisions apply only to private passenger vehicles and not to commercial vehicles and common carriers is further answered in the Supreme Court opinion (p. 123): "[T]here is no constitutional requirement that a regulation, in other respects permissible, must reach every class to which it might be applied—that the legislature must be held rigidly to the choice of regulating all or none. *Patsone* v. *Pennsylvania,* 232 U.S. 138, 144 [34 S. Ct. 281, 58 L. Ed. 539]; *Miller* v. *Wilson,* 236 U.S. 373, 382, 384 [35 S. Ct. 342, 59 L. Ed. 628]; *International Harvester Co.* v. *Missouri,* 234 U.S. 199, 215 [34 S. Ct. 859, 58 L. Ed. 1276]; *Barrett* v. *Indiana,* 229 U.S. 26, 29 [33 S. Ct. 692, 57 L. Ed. 1050] . . . . It is enough that the present statute strikes at the evil where it is felt and reaches the class of cases where it most frequently occurs."

Section 38-327 (e) provides that all obligations of §§ 14-112 to 14-144 of the financial responsibility law

shall remain, while § 38-350 gives the provisions of title 14 primacy over the act in cases of conflict. It should be noted that under § 14-112 it is unclear whether the language, and thus the obligations thereby created, apply solely to owners of vehicles or to operators also, although in *Dempsey* v. *Tynan*, 143 Conn. 202, 120 A.2d 700, we construed these provisions to be applicable to owners and operators alike. Reading these provisions consistently with § 38-327; *Collins* v. *York*, 159 Conn. 150, 162, 267 A.2d 668; we find that the financial responsibility law, as incorporated in § 38-327 (e), must be construed to apply solely to owners of vehicles rather than nonowner operators, to be consistent with the obligations of § 38-327. The no-fault act merely makes insurance a necessary incident of ownership, not of mere operation. Thus, if a driver who does not own a vehicle is operating a private passenger automobile of another individual who does not carry the basic security, in the event of a mishap precipitating a need for basic reparations benefits, for example an injury to a passenger in that vehicle, the owner, who has consciously chosen not to carry security nor file as a self-insurer, and not the operator, is liable under § 38-327 (e). To require otherwise might subvert the concept of "no-fault" and could, arguably, result in a deprivation of property of the nonowner operator without due process of law if the operator is the innocent victim of another motorist's delict.

Section 14-112 lists a variety of offenses the commission of which jeopardizes one's operator's license unless a certificate of insurability (form SR-22) is filed indicating proof of insurance. As to owners of private passenger vehicles, no self-incrimination problem exists since it is not required that a signed

statement be filed as to whether or not the owner is insured. The owner may elect not to file the form SR-22 and suffer suspension, not necessarily criminal prosecution under § 38-327 (d). Since only owners must carry basic security, however, the privilege or right to hold an operator's license may not be jeopardized if a nonowner operator of a vehicle is not personally insured. Thus, title 14 and title 38 read consistently allow the commissioner to order a certificate of insurability from a vehicle owner, although an operator may still be held to post security under the provisions of title 14.

The financial responsibility law was construed in *Dempsey* v. *Tynan,* supra, 208: "The purpose of the legislature in enacting the financial responsibility provisions of the motor vehicle law was to keep off our highways the financially irresponsible owner or operator of an automobile who cannot respond in damages for the injuries he may inflict, and to require him, as a condition for securing or retaining a registration or an operator's license, to furnish adequate means of satisfying possible claims against him." The effect of § 38-327 is to make the vehicle owner responsible for basic reparations, and thus no necessity exists to require that the nonowner operator post similar security under this statute or jeopardize his license.

As to another of the plaintiffs' arguments that this legislation forces the owners of private passenger vehicles to deal with private, profit-seeking companies, we can do no better than to quote the opinion of Justice Reardon in *Pinnick* v. *Cleary,* 360 Mass. 1, 25, 271 N.E.2d 592, upholding the Massachusetts no-fault act: "Nor can the plaintiff complain because the medium through which the . . .

self-protection must be obtained is a private, profit-making corporation, as opposed to some kind of governmentally managed pool. . . . We see no distinction for due process purposes between the requirement of private insurance for self-protection and for the protection of others. It is an incidental and completely nonobjectionable concomitant of many regulatory statutes that citizens are required thereby to enter into transactions for their own benefit with private corporations."

The plaintiffs claim that the underwriting guidelines currently employed by several insurers violate their rights to due process of law and equal protection of the law. The claim is founded upon an allegation that these guidelines are essentially arbitrary and unreasonable, that refusal to accept an applicant's request for insurance stigmatizes that applicant as an unsavory risk thus prejudicing his ability to obtain coverage from one of the other 186 companies in the state and thereby forcing that person to obtain coverage under the assigned risk plan or to face prosecution and license suspension for failure to carry security. We are not persuaded to find as the plaintiffs suggest. The legislature has established a medium for administrative and judicial review whereby any potential insured who feels himself aggrieved by the rates or underwriting policies of any insurer can secure a review of that claim by the company, by the insurance commissioner, and ultimately by the courts. General Statutes § 38-201p.

Under Connecticut's assigned risk plan, known as the Connecticut automobile insurance plan, established pursuant to § 14-130, the relevant insurance to satisfy the requirements of the act is available

to every driver. This plan requires each of the 187 insurance companies, in proportion to their automobile insurance writings in Connecticut, to insure the "small number of applicants" who are considered to be unreasonably high risk applicants. The availability of insurance to all applicants through the plan is documented in the DOT study of assigned risk plans which specifically notes that Connecticut is one of only nine states whose assigned risk plans guarantee coverage to every licensed driver who continues to pay the premiums. The presence of the insurance commissioner of Connecticut as an ex officio member of the governing board of the Connecticut automobile insurance plan further demonstrates the state's commitment to assure the availability of insurance at reasonable rates for all licensed applicants. It also is appropriate to note that the number and identity of persons purchasing insurance through the assigned risk plan varies from year to year as persons in the assigned risk plan find insurance available to them through the ordinary market place, while others, because of their driving records, find they must purchase insurance through the assigned risk plan. And finally, § 38-327 (a) does not by its terms require the security to be purchased from private insurers; indeed, as the parties have stipulated, at least three owners self-insure under the act.

## VIII

### FIFTH AMENDMENT CONSIDERATIONS

The plaintiffs complain that § 38-327 (d), which imposes criminal sanctions for failure to carry the required security, when combined with provisions under title 14 of the General Statutes for the reporting of motor vehicle accidents, results in infringe-

ment upon the rights guaranteed under the fifth amendment to the United States constitution and article first, § 8, of the Connecticut constitution against self-incrimination.

Section 14-108, entitled "Report of accidents," directs that a motorist involved in an accident in which there is personal injury or property damage in excess of $400 file a written report of the circumstances of the accident within five days with the commissioner of motor vehicles. Information with regard to time, place, injuries, parties' names and addresses and operators' license numbers, identification of involved vehicles and damaged property, the cause of the accident and such further facts as the commissioner may require must be included in the report. Failure to file such a report may result in suspension of an operator's license and a fine. Section 14-116, entitled "Accident reports," states that the reports required by § 14-108 "shall . . . contain information to enable the commissioner to determine whether the requirements for the deposit of security under section 14-117 are inapplicable by reason of the existence of insurance or other exceptions specified in sections 14-113 to 14-133, inclusive."

Once a determination has been made that there is no insurance, § 14-117 establishes the procedure for deciding the amount of security or the suspension of license and registration. Subsection (c) provides, however, that the section does not apply where there is insurance covering the accident. The commissioner has made provision for a uniform accident report form known as FR-1, and the bottom third of this form, called an SR-21 form, requests detailed insurance information, calling for a separate signature. The language at the top of form FR-1 states

that "failure to report may result in the suspension of operator's license." The commissioner has also issued and is using a form SR-104 to notify police departments of uninsured owners for possible prosecution.

Thus, an uninsured motorist involved in a reportable accident must submit a signed statement as to whether or not he is insured and by failing fully to complete the FR-1 accident form he is subject to a fine and license suspension. By completing the FR-1 form and attesting that he is uninsured he thus furnishes the commissioner with a signed statement confessing his failure to carry the compulsory security and exposes himself to prosecution under § 38-327 (d). It is unclear whether the provisions with regard to security under title 14 are necessary in light of § 38-327, despite § 38-350. The quoted provisions of title 14, on their face and in their prior application, do not offend any constitutional provision. *Dempsey* v. *Tynan,* 143 Conn. 202, 120 A.2d 700. Similarly, the criminal sanctions of § 38-327 (d), deemed necessary by the legislature to enforce the mandatory security requirements of the act, are, on their face and in their separate application, constitutionally sound. However, insofar as § 14-108 requires a motorist to submit a signed statement of his failure to carry insurance and § 38-327 (d) punishes such failure, criminal prosecutions for violations of § 38-327, when grounded upon the admissions contained in the FR-1 form, are constitutionally impermissible, for it is patent that the compelled disclosures would confront the reporter with substantial hazards of self-incrimination. *California* v. *Byers,* 402 U.S. 424, 429, 91 S. Ct. 1535, 29 L. Ed. 2d 9; *Marchetti* v. *United States,* 390 U.S. 39, 88 S. Ct. 697, 19 L. Ed. 2d 889. This is not to say that

an uninsured motorist may not be subjected to prosecution under § 38-327 (d), nor that he is immunized by signing the FR-1 form, but rather that prosecution for this offense may not utilize the mandated statement of uninsurance required by § 14-108 and form FR-1. The burden of proof in such prosecution, as in all others, rests upon the commissioner and the state. The FR-1 report, filed as an administrative aid, may not be employed in the investigation or prosecution of an individual under § 38-327 (d); and it may well be advisable for the legislature to consider the duplicity of purpose and function of the security provisions of the no-fault act and those of title 14.

### CONCLUSION

We have treated the issues as briefed by the parties. Justice dispensed in the abstract cannot be said to be perpetually sound and we have attempted to dispose only of those issues foreseeable at the present time, being ever mindful of the oft repeated principles which must govern our decision in a case such as this. What we said in *Kellems* v. *Brown,* 163 Conn. 478, 483, 313 A.2d 53, bears repeating: " '[A] plaintiff, in challenging the constitutionality of a statute, must sustain the burden of proving that the effect or impact of the challenged statute on him adversely affects a constitutionally protected right which he has. "This means a right which he proves that he has under the facts of his particular case and not merely under some possible or hypothetical set of facts not proven to exist." *Hardware Mutual Casualty Co.* v. *Premo* . . . [153 Conn. 465, 471, 217 A.2d 698].' *Adams* v. *Rubinow,* 157 Conn. 150, 152, 251 A.2d 49." Again quoting from *Adams* v. *Rubinow* we also repeated in *Kellems* v. *Brown,* supra, 486: "It is well settled that a plain-

tiff who attacks a statute on constitutional grounds has no easy burden. As this court said in *Adams* v. *Rubinow,* . . . 'Because of the separation of powers, one claiming that a legislative enactment is invalid on the ground that it is unconstitutional must establish its invalidity on that ground beyond a reasonable doubt.' " We do not mean to foreclose further judicial discussion of the act in areas where it has not been appropriate for this court to discourse.

Individual rights and remedies must at times and of necessity give way to the interests and needs of society. If the law is to continue on the path of homogeneity to be the means of order in the complex social scheme of our growing populace, the legislature must be allowed to create alternate remedies for ills where the machinery of justice is so burdened that justice is, in fact, denied to many. We are in an age of the nascence of a new form of government, which might best be labeled an "administocracy" — rule by administrative agencies. Even the legislative branch of government, both state and federal, must so delegate many of its tasks or fail to provide the people all that their government should. It is no different with the judiciary. No longer may we align with the ancient civil law premise that recourse to the courts is the primary or *only* alternative to force for redress of injuries. We must recognize today the power of the legislature to aid the process of justice with reasonable alternate remedies, and no less may we do if our courts are to remain open to those suffering grievous wrongs and the legal process is to remain untethered and vital.

No sufficient purpose would be served by giving specific answers to the several questions presented

in the reservation. We advise that on the facts as stipulated by the parties, we do not find the act under consideration to be unconstitutional.

No costs will be taxed in this court in favor of any party.

In this opinion the other judges concurred.