[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CT Page 13715
Before the court is a motion for summary judgment brought by the defendants. The plaintiffs are Ivy Hansen and William Hansen and the defendants are several emergency medical response personnel, fire departments, and the Town of Montville. The complaint is a lengthy one comprising 48 counts and 178 pages and arises out of the following facts.
It should be noted that the real contention between the parties is not so much the facts, but the legal implications of those facts for the various claims made and defenses that are raised. In any event, in October, 1995, Mrs. Hansen fell at her home and injured her leg. She could not move from the spot where she fell which was located at the landing to her stairs near her front door. Mr. Hansen called 911 and firemen and/or emergency ambulance personnel arrived from the defendant Mohegan Fire Company and the defendant Montville Fire Company. At the time of the unfortunate accident, Mrs. Hansen was around 5'3" and weighed 195 pounds. Mrs. Hansen's leg was put into a cast and the individual defendants then set about removing her from her home to the ambulance so that they could transport Mrs. Hansen to the hospital. The lead firefighter concluded that due to Mrs. Hansen's size and location, they could not position a stretcher to carry her out of the house. The plaintiff's contention is that there were other devices in the ambulance that could have been used to safely carry Mrs. Hansen out of the house.
In any event, several of the defendants manually attempted to carry her out of her home. Mrs. Hansen alleges as she was being carried, she began to slip toward the ground, her arm was pulled sharply and as a result Mrs. Hansen claims to have suffered severe injury to her rotator cuff. Mrs. Hansen claims to have cried in pain indicating she was being hurt, but the defendants just kept carrying her toward the stretcher which was placed just outside the house. She was then placed on the stretcher, but she claims no attempt was made to stabilize her arm or shoulder, and even when in the ambulance little was done with regards to such stabilization.
The plaintiff Ivy Hansen has brought numerous claims in many counts. They are negligence, gross negligence, negligent supervision and training, willful and wanton conduct, willful and wanton negligence, willful and wanton conduct by way of supervision and training, willful and wanton negligence by way of supervision and training, indemnification by the Town of Montville based on each of the foregoing claims against the individually named municipal defendants. The husband William Hansen has brought claims of loss of consortium and bystander emotional distress based on the just mentioned legal allegations of his wife. CT Page 13716
The motion for summary judgment is based on the following arguments: (1) all claims based on negligence are precluded by the Good Samaritan Act, § 52-557b(b) of the General Statutes; (2) such negligence claims are barred by the doctrine of governmental immunity; (3) there is no indemnity for willful and wanton conduct; (4) there is no evidence of such conduct; (5) there is no cognizable claim for gross negligence; (6) neither is there such a claim for "willful wanton" negligence; and (7) there is no appropriate claim for bystander emotional distress.
The standards to be applied in deciding a motion for summary judgment are well known and have been ably stated by both parties. If there is a genuine issue of material fact, the court cannot fairly decide it since to do so would deprive a party of their constitutional right to a trial. On the other hand, summary judgment procedure was established for an important purpose. If no such issue of material fact exists, the court should not hesitate to grant such a motion in order to save the moving party the time, expense and upset that would result from continuing non-meritorious litigation. As specific claims are addressed requiring more detailed discussion of summary judgment standards as to the particular claim at issue, the court will attempt to address such issues.
 1. Good Samaritan Law
The defendants move for the dismissal of all claims based on negligence and rely on the so-called Good Samaritan Law set forth in § 52-557b(b) of the General Statutes. They claim that the statute provides them with immunity from any claim brought by the plaintiff based on an allegation of negligent care and treatment of the plaintiff Ivy Hansen. There have been no appellate case interpreting the purpose or goals of this statutory subsection which can serve as a guide to its appropriate ambit. However, many jurisdictions have similar laws. Statutes like ours and cases in other jurisdictions arising under them have been discussed in several articles; see "Good Samaritan Statutes," 68 ALR 4th 294; "Liability for Negligence of Ambulance Attendants, Emergency Medical Technicians and the Like, Rendering Emergency Medical Care Outside Hospital," 16 ALR 5th 605; "Cause of Action Against Emergency Medical Technician or Emergency Medical Care Service for Improper Response to or Improper Treatment of Medical Emergency," 8 COA.2d 415, (COA stands for Cause of Action).
The plaintiff presents several arguments as to why the defendants should not be able to take advantage of the Good Samaritan Law (§52-557b(b). That statute in relevant part says:
 "(b) A paid volunteer fireman . . . or ambulance CT Page 13717 personnel, who has completed a course in first aid offered by the American Red Cross, the American Heart Association, the National Ski Patrol, the Department of Public Health or any director of health as certified by the agency or director of health offering the course, and who renders emergency first aid to a person in need thereof, shall not be liable to such person assisted for civil damages for any personal injuries which result from acts or omissions by such person in rendering the emergency first aid which may constitute ordinary negligence. . . . The immunity provided in this subsection does not apply to acts or omission constituting gross, willful or wanton negligence."
 (a)
The plaintiff does not contest the fact that the defendants are paid or volunteer firemen or ambulance personnel, but does offer several reasons why each of them should not be afforded the protection of the statute. It is argued that they did not take the appropriate first aid course specified in the statute except for two individuals Edmund Bragdon and Hafez Al Aisharabi.
In this regard, the relevant portion of the statute must be examined. One of the prerequisites of immunity under the statute is that the emergency personnel trying to take advantage of its protections must have "completed a course in first aid offered by the American Red Cross, the American Heart Association, the National Ski Patrol, the Department of Mental Health or any director of health" — but "completion" of a course standing alone is not enough. The "completion" must be "certified by the agency or director of health offering the course." Except for the two individuals mentioned, none of the other individual defendants, according to the plaintiff, took a "first aid" course from the Department of Public Health or any of the organizations referred to in the statute. However, the defendants have submitted an affidavit signed by one Renee Hulska for Debra Tomassone.[1] Each of the defendants' affidavits states the individual defendants "held emergency medical technician certification" on the date of the accident and goes on to state that "as part of the emergency medical technician training and certification (each of the defendants) had completed an approved U.S. Department of Transportation emergency medical technician training program which included basic emergency medical care skills." Ms. Tomassone is the health services supervisor of licensure and registration for the Department of Public Health and the affidavit indicates "a portion of (her) duties includes the certification of emergency medical technician CT Page 13718 personnel."
The plaintiffs argue this is not enough. To benefit from the statutory immunity, "the defendants must have `completed a course in first aid,' by the listed groups" (page 17 of 2/6/01 brief). Furthermore, this statute is in derogation of the common law and must be strictly construed insofar as the immunity it grants limits common law rights. Copeland v. Warden,225 Conn. 46, 53 (1993); Gore v. People's Savings Bank, 235 Conn. 360,382 (1995); also cited are State v. Nugent, 199 Conn. 537, 548 (1986);Colon v. New Haven, 60 Conn. App. 178, 183 (2000).
In order to address this issue and the other questions raised concerning the applicability of this act to the defendants it is important to keep in mind why these Good Samaritan Laws were passed. An Illinois court said in discussing an act not dissimilar to ours that "The legislature intended to encourage emergency response by trained medical personnel without risk of malpractice liability for every bad outcome or unfortunate occurrence. Emergency situations are often fraught with tension, confusion and, as here, difficult physical locations for giving medical care. Emergency personnel must not be afraid to do whatever they can under less than ideal circumstances," Gleason v. Village of PeoriaHeights, 565 N.E.2d 682, 684 (Ill., 1990); Bowden v. Cary Fire ProtectionDist., 719 N.E.2d 548, 553 (Ill., 1999), cf. 40 Texas Law Review 909, 910 (1962). An obvious goal of such laws is also to encourage people to go into this important line of work and not make them reluctant to perform certain parts of their job for fear of suit, Jennings v. Southwood,521 N.W.2d 230, 234 (Mich., 1994). Infringement of common law rights is an important consideration, but ameliorative acts of this type must not be so narrowly construed so as to defeat their purposes which was to provide "the citizens of this state with efficient, safe and professional ambulance service." Anderson v. Little Dairs Funeral Home,251 S.E.2d 250, 252 (Ga., 1978). All this leads to the question of training. Many of these acts provide immunity to emergency personnel if they have taken training courses. Such a requirement ensures uniformity in the delivery of services across the state and obviously increases the proficiency and skills of those performing the service. Also, such training provides a benchmark to determine whether and when immunity should be granted under these acts; as the Gleason court said: "In other words, since defendant's EMTs were providing plaintiff with life support services at the basic level which they were trained to perform, defendant had immunity from liability for misconduct amounting to no more than simple negligence in the performance of those services," 565 N.E.2d at page 684. The Bowden court said the Illinois statute provides immunity "in instances where the EMTs have provided the level of life support service for which they have been trained regardless of whether they have performed such services negligently," 710 N.E.2d at page 552. Perhaps even CT Page 13719 more to the point is the criticism in a law review article of a Texas Good Samaritan statute which provided immunity to any person "who administers emergency care in good faith." The act did not require training or that the person rendering aid even be an emergency worker. The article said that "what volunteers are produced are likely to be untrained and this may well do more harm than good in attempting medical assistance," 75 Harvard Law Review 641, 642 (1962).
How has our legislature tried to ensure uniform, high quality training for emergency medical service personnel?
This accident happened in 1995; then, as now, "Emergency Medical Services" were governed by Chapter 368d of the General Statutes, §§19a-175 et seq. Subsection (e) of § 19a-175 defined an "emergency medical technician" as someone "who has successfully completed the training requirements established by the commissioner of health services and has been certified by the department of health services." (In 1995, the Commissioner and Department of Public Health and Addiction Services was replaced by the Commissioner and Department of Public Health.) The department was responsible for coordinating and administering the statewide emergency medical care system (§ 19a-176) and in §19a-177 (e) the commissioner was to establish minimum standards and regulations so as to develop training for emergency medical technicians (EMTs) and firefighters among others. Under subsection (f), the commissioner was, in fact, to "coordinate training of all personnel related to emergency medical service." Section 19a-195 provided in 1995, as now, that "all emergency medical response services to be staffed by at least one certified emergency medical technician." Section 19a-187 (c) then, as now, required that "all state agencies concerned with the statewide emergency medical services system shall cooperate with the appropriate agencies of the United States . . . with respect to the planning and coordination of emergency medical services."
The affidavit submitted on behalf of the individual in charge of EMT certification indicates that each of the defendants "had completed an approved U.S. Department of Transportation Emergency Medical Technician training program which included basic emercency medical care skills" (emphasis added by court). Section 52-577b(b) talks in terms of immunity being given to persons referred to in the statute who have completed "a course in first aid." The Random House Dictionary defines "first aid" as "emergency medical aid or treatment given to someone injured, suddenly ill, etc. before regular medical services can be obtained;" Webster's New Third International Dictionary defines "first aid" as "emergency and sometimes make shift treatment given to someone (as a victim of an accident) requiring immediate attention, where regular medical or surgical care is not available." The affidavit appears to indicate that CT Page 13720 the training these EMTs received was more extensive than the statute required — in any event, they received a course in what was in effect "first aid."
In light of the foregoing and the apparent certification of EMTs given by the state agency entrusted with ensuring the safety and efficiency of emergency medical care, this court is reluctant to, in effect, rule that the statutory immunity provided to EMTs throughout the state is not operative insofar as they took an approved federal EMT training course — all for no reason rationally connected to the appropriate operation of the emergency care system. Faced with such a conundrum what do courts do — they usually give a liberal and, some would say, common sense reading to statutory language where a too rigid reading of legislation would lead to silly results.
It is true that taking a "course in first aid" is not enough under § 52-557b(b). The course under the statutory language must be offered by the American Red Cross, the American Heart Association, the National Ski Patrol, the Department of Public Health or any director of health, as certified by the agency or director of health offering the course . . . But the state Department of Public Health (once the Department of Health Services) has submitted an affidavit that says as to these individual defendants, "as part of the Emergency Medical Technician and certification" each one of them took what, in effect, was a first aid course — that is the basis of there having been certified. Moreover, the course was given by a federal agency with whom the department as an agency of the state is required by the legislature to cooperate so that even though the course was apparently not given by department of health services personnel so as to be "offered" by the department in that sense, it evidently was recognized by the department as an appropriate and approved training vehicle that could be used as the basis for state EMT licensing and certification. Therefore, the course was offered" by the department as a method of achieving licensing and certification as an EMT and as a necessary corollary this satisfies the course in first aid requirement of § 52-577b(b) to receive immunity. Any other reading of the statutory scheme would lead to inexplicable results. It could mean that under subsection (b) a person who is not a licensed and certified EMT but who is a fire or police man or ambulance worker can receive the protection of immunity if he or she takes a first aid course from "any director of health," or personnel of the Department of Public Health or the specific other organizations listed but a licensed and certified EMT, so licensed and certified because he or she took at least the equivalent of a first aid course from a federal agency with whom the department is enjoined to cooperate — such an individual could not receive immunity. This would in effect defeat the CT Page 13721 very purposes of passing these Good Samaritan Laws in the first place in this and other states — to encourage trained people to enter this field of emergency medical service without the fear of suit for ordinary negligence — such a result would also lead EMTs to question the purpose and rationality of the whole state certification and licensing scheme.
 (b)
The plaintiffs next contend that the defendants cannot rely on the protections afforded by our Good Samaritan Law because they were not rendering "first aid." And even if they were rendering "first aid" the statute specifically provides that it applies only as to "emergency first aid."
There are no appellate cases defining the meaning of "first aid" under § 52-557b. The term "first aid" is defined in Webster's Ninth New Collegiate Dictionary (1987) as "emergency care or medical treatment given to an ill or injured person before regular medical treatment can be obtained." Two Superior Court decisions have examined the meaning of the term "emergency first aid" as used in the statute. Crew v. YaleUniversity, et al, 1997 WL 291197 (Conn.Sup. 1997), held that the statute did not apply since the plaintiff was not challenging the first aid actually rendered to him but was alleging negligence in the manner in which his severed finger tip was transported to the hospital. In Shomskyv. City of Shelton Police Dept., et al, 1997 WL 746380 (Conn.Sup. 1997), the statute was held inapplicable because "essentially, the claims of negligence against [the defendant] relate not to the actual care and treatment administered to the plaintiff's decedent at the scene of the emergency, but rather to a delay in responding to the call for emergency service."
The factual settings of Crew and Shomsky do not have much bearing on what is involved in this case. Here, the plaintiff was injured or her injuries were aggravated by the alleged inappropriate way she was carried from the place where she fell in her home to an emergency vehicle which was going to transport her to the hospital for the purpose of treating her for the injuries sustained in the fall. But the basis of the claim is that given the condition of the plaintiff, her expressions of pain, the lifting and transportation procedure in her case was not an appropriate one given her medical condition. Other jurisdictions have had no problem with applying their Good Samaritan Laws to cover situations where EMTs are accused of inappropriate methods of securing a patient for transportation to a medical facility or of moving a patient from his or her home to the emergency vehicle which will provide transportation to a hospital. See Ambrose v. New Orleans Police Amb. Service, 639 So.2d 216, CT Page 13722 219 (La., 1994) (allegation of gross negligence in way deceased assisted to stretcher rather than having it brought to him and in delay at house before transporting deceased to hospital); Natsch v. City of Southfield,397 N.W.2d 294, 295 (Mich.App., 1986) (claim that appellants failed to properly immobilize plaintiff's head and neck when moving him from accident scene, thus aggravating his cervical condition).
In fact, it is difficult to see how it can be said that using or deciding upon an appropriate mode of transporting a patient from an accident scene to an emergency vehicle is not part of the emergency care and treatment actually rendered to an accident victim at the accident site. To hold otherwise would mean that a large part of what emergency personnel do at accident sites is not covered by § 52-557b.
Another way to go about dealing with this issue is to examine cases defining medical malpractice and especially that case which discussed whether a patient's fall from a wheelchair during a hospital physical therapy session sounded in medical malpractice or ordinary negligence,Trimel v. Lawrence Memorial Hospital, 61 Conn. App. 353 (2001). Medical malpractice has been defined as "the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss or damage to the recipient of those services." Santopietrov. New Haven, 239 Conn. 207, 226 (1996). In Trimel, the court used three factors to decide whether the fall from the wheelchair was the result of ordinary negligence or medical malpractice. The third factor is the one relevant to the present discussion. That factor examined whether the alleged negligence was substantially related to medical diagnosis or treatment and involved the exercise of medical judgment, id. page 358. As said by Judge Munro in Wilson v. Yale-New Haven Hospital, Inc.,
CV00-0444687 (N.H.Sup.Ct., 3/26/01), "An injury may be substantially related to a patient's medical diagnosis or treatment even though the patient was not receiving "treatment' at the time the injury occurred.Trimel, 61 Conn. App. at 355 (finding injury that occurred at treatment site during preparation for physical therapy session was substantially related to medical diagnosis and treatment); Levett, 158 Conn. at 569
(finding medical malpractice where injury occurred in examining room when patient was undressing in preparation for a scheduled doctor's visit)." If all of this meets the definition of medical malpractice, it is difficult to see how what occurred here regarding the carrying of Mrs. Hansen would not be delivering emergency care or treatment requiring the exercise of medical or appropriate health care judgment — clearly, such activity would involve the provision of "emergency first aid" under § 52-557b(b). CT Page 13723
In fact, the plaintiff's complaint is replete with suggestions that the defendants were negligent because they failed to use sound medical or health care judgment — they failed to properly assess Hansen's condition, and having so assessed it, they failed to carry her to the ambulance in a manner appropriate to that assessment, they failed to use the appropriate equipment or technology to handle, move or carry the plaintiff. In fact, they failed to follow applicable procedures for Emergency Medical Technicians set forth by the federal Department of Transportation with regard to preventing further injury, minimizing motion, and the use of appropriate equipment and technology to immobilize, lift and carry a patient such as Mrs. Hansen, paragraph 38 of original November, 1996 complaint. The plaintiff's expert, Mr. Epstein, submitted a report for this motion which, among other things, states that he examined the "ambulance run report" and the plaintiff's condition and the building she was in and nothing indicates she was in "imminent danger" requiring the defendants to lift and carry her the way they did. Mr. Epstein, who is an emergency medical service instructor and has taught many courses for EMTs and "medical courses for police departments," criticizes the defendants on the basis that they violated the standard of care for EMTs on lifting and carrying Mrs. Hansen. In fact, their actions were "not an approved method or taught in the local, State of Connecticut or National Department of Transportation course as a proper way to transport by lifting and moving the patient, which is the standard of care."
Clearly, the defendants were delivering "first aid" to the plaintiff when transporting her since the propriety of the transportation depended on assessment of her medical condition and can be evaluated by health care standards.
The further argument raised by the plaintiff, that even if the defendants were delivering first aid it was not emergency first aid, does not bear much scrutiny. Mr. Hansen called "911" after his wife fell — that's how the defendants got to the house. There is no dispute that Mrs. Hansen had to be transported to the hospital. The legislature cannot be taken to have meant to equate "emergency" with life threatening. To have so restricted the operation of § 52-577b would strip EMTs of protection in a variety of situations which, though not life threatening, require hospital care such as broken bones, extreme pain caused by cuts or burns, etc. Our legislature has not defined "emergency" but the Utah statute is a good starting place. Its Good Samaritan Law says "emergency" means an unexpected occurrence involving injury, threat of injury or illness to a person including motor vehicle accidents, disasters and other accidents or events of a similar situation. This case certainly meets that definition of emergency. The court has found only two cases dealing with this issue neither of which CT Page 13724 supports the plaintiff's position. In City of East Chicago v. Litera,692 N.E.2d 898, 900 (Ind., 1998), the court held the Good Samaritan statute did not apply. The plaintiff fell out of his wheelchair when EMTs were bringing him back to his house — the fire department had ordered a section of town evacuated but then allowed people to return so the court said the emergency was over. In Dahl v. Turner, 458 P.2d 816,823 (N.M., 1969), the statute did not apply to a defendant who was just giving the plaintiff a ride home. The court held that even if this was care, it was not "emergency care." There was no pressing need for the transportation, the plaintiff was just cut on the arm and appeared confused, he did not want to go to a doctor, the police, for example, would not have required him to go to the hospital.
By any rational criteria, these defendants were responding to anemergency, and once they got to her home, were delivering emergency first aid. By definition, emergency care or treatment is such care or treatment delivered before regular medical treatment can be obtained — such regular treatment was needed thus necessitating and defining the emergency and transportation was needed to get the regular medical treatment for Mrs. Hansen.
 (c)
The plaintiffs also make a broad claim that § 52-577b is unconstitutional. Article I § 10 of the state constitution is violated because our Good Samaritan statute abolishes a preconstitutional right of a party whose right was in effect prior to 1818 when the constitution went into effect. For good measure, § 52-577b violates both state and federal constitutions on equal protection, due process and access to the court's grounds.
As to the equal protection argument, the plaintiffs say that "clearly" the statute discriminates against injured negligence claimants in favor of a separate class — defendants covered by the act. Such classifications must be reasonable and rest upon some difference having a substantial relation to the legislation's objective, Gentile v.Altermatt, 169 Conn. 267, 296 (1975). "Clearly," it is argued there is no "legitimate or rational interest" in helping negligent defendants over claimants. Public policy in favor of volunteer firefighters should not come at the cost of people injured by their negligence. The plaintiffs concede the injured claimants are probably not a class, for equal protection purposes, that is definitely suspect, but they should be given quasi-suspect status which is a heightened scrutiny test — this is because they are politically powerless. Other jurisdictions, according to the plaintiffs, have dealt with this equal protection argument and have held statutes unconstitutional which abrogate common law rights and apply CT Page 13725 a quasi-suspect classification test. The plaintiffs cite Farley v.Engelken, 740 P.2d 1058 (Kan., 1987); Arneson v. Ohio, 270 N.W.2d 125
(ND., 1978); Graley v. Satavathan, 343 N.E.2d 832 (Oh., 1976); June v.State Bd. of Medicine, 555 P.2d 399.
None of these cases examine the constitutional viability of Good Samaritan Laws. Farley held that the legislative abrogation of the collateral source rule in medical malpractice cases violated the equal protection clause of the Kansas constitution. The North Dakota court inArneson reached a similar result as to a statute which limited recovery in medical malpractice cases and the right of jury trial if a claimant wished a recovery beyond $100,000 — the remedy was a suit against a patients' fund without a jury. The court in June had equal protection problems with a statute placing limits on remedies and recoveries in medical malpractice actions. The Graley case held that an Ohio statute which provided that certain collateral benefits be deducted from a medical claim award and be listed in the complaint also violated the state and federal equal protection clause.
In any event, the plaintiffs go on to argue that even if the quasi-suspect standard is not applied, the power to discriminate is not unlimited. Touch v. Ives, 162 Conn. 274 (1972). An act must serve a public purpose; classes cannot be established "that have no reasonable relation to any permissible public purpose. . . . Clearly, aiding defendants and discriminating against claimants cannot possibly have any reasonable relation to any permissible purpose." (2/6/01 brief.)
Equal protection analysis can become quite abstract and esoteric, so it is best to ground such discussions in the actual realities statutes seek to confront and to refer to cases which have dealt with constitutional attacks on the exact type of statute before the court. There have been cases attacking Good Samaritan Laws brought by parties claiming injury at the hands of EMTs and they have been upheld against constitutional attack. In Anderson v. Little Davenport Funeral Home, 251 S.E.2d 250
(Ga., 1978), the plaintiff argued that the state Good Samaritan Law violated the due process and equal protection clauses of the state and federal constitution since the statute's "only purpose" was to deprive an individual injured by ambulance workers of her cause of action in negligence and merely benefits the defendants' private interests. The Georgia Supreme Court said the equal protection clause "allows classification by legislation so long as the basis for such classification bears a reasonable relation to the purpose and objects of the legislation and so long as the legislation operates alike on all persons similarly situated," id. p. 252. Georgia's Good Samaritan statute "was enacted as part of a comprehensive act to provide the citizens of (Georgia) with efficient, safe and professional ambulance service. . . . CT Page 13726 The statute is carefully drawn so as to grant immunity to providers of ambulance service only for their acts and omissions in rendering such emergency care," id. p. 252. The court at page 253 went on to note that the statute, § 88-3114 of the Georgia Code, takes account of the fact that the
 "General Assembly recognized that insurance for civil liability covered by the exemption would be extremely expensive and difficult to obtain. This problem, combined with the virtually unlimited potential civil liability, could be enough to drive many providers of ambulance service out of the business and greatly discourage others from entering. The effect, in many areas of the state, would be to make emergency ambulance service virtually unobtainable. In recognition of this, the legislature chose to grant immunity from civil liability to providers of such emergency services who were licensed under the Act.
 "Code Ann. § 88-3114 does not unfairly discriminate against the appellant. The statute is uniform in that it treats all persons who receive emergency medical treatment from the providers of a licensed ambulance service in the same way. We find that Code Ann. § 88-3114, being reasonable and nondiscriminatory, does not violate the equal protection clauses of the State and Federal Constitutions.
 "Since Code Ann. § 88-3114 complies with the requirements as to equal protection of the laws, it amounts to due process of law."
The comment in "Good Samaritans," 64 Columbia Law Review 1301, 1312-1313, is instructive. Citing numerous cases the article says: "Statutory limitations on common law rights of recovery have been held constitutional when — as in the existing Good Samaritan statutes — they have merely restricted available remedies." The article went on to note that workers' compensation statutes have been upheld because they merely substitute a statutory remedy for one at common law. Statutory limitations on the right to general damages in defamation actions have been upheld because the claimant still retained the right to file a common law cause of action. "Finally, courts have generally sustained guest statutes that limit the rights of automobile passengers to recover from the driver only when he is guilty of gross negligence or willful and wanton misconduct . . . (the courts have held such CT Page 13727 legislation employs a fair classification and preserves at least a limited remedy," cf. Silver v. Silver, 108 Conn. 371 (1928).
The legislature certainly has an interest in ensuring that efficient and safe first aid be provided to its citizens in situations of emergency in laws such as § 52-557b(b). The classification is within the legislature's wide range of discretion under the police power since it has a fair and substantial relation to the object of the legislation — as noted in the Anderson case such legislation encourages the availability of emergency services. Furthermore, by requiring state certification and training as a predicate to immunity, the state has taken additional steps to try to ensure that the services delivered will be adequate to the task and uniform throughout the state. In affirmingSilver, Justice Stone writing for the federal Supreme Court said, "that the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object," that is certainly the case here so that this court does not accept the constitutional attack, state and federal, made upon § 52-577b.
 (d)
Given the applicability of our Good Samaritan Law to this case, certain of the plaintiffs' claims, insofar as they are based on "ordinary negligence" (see § 52-557b(b)), must be dismissed. This would apply to the first count (negligence claim by Ivy Hansen), the third count (negligence — loss of consortium; such claims are derivative by nature, Hopson v. St. Mary's Hospital, 76 Conn. 485, 494 (1979). The seventh count based on negligence and seeking indemnification from the defendant town must also be dismissed, see Wu v. Fairfield, 204 Conn. 435,438 (1987), as well as count nine which also seeks indemnification for the loss of consortium claim.
What about count two alleging negligence and making a claim for Mr. Hansen of bystander emotional distress and count eight seeking indemnification on the bystander emotional distress claim? The court, later in this decision, has decided no bystander claim is viable under any of the theories of liability advanced. But, additionally, for reasons about to be set forth, also concludes that immunity from negligence liability under § 52-557b(b) also specifically precludes Mr. Hansen's bystander emotional distress claim insofar as it arises out of alleged negligent conduct by the defendants.
If we look at subsection (b) of § 52-557b(b), the language is quite specific. It says that individuals granted immunity under § 52-577b(b) "shall not be liable to such person assisted for civil damages for any CT Page 13728 personal injuries which result from acts or omissions by such person in rendering the emergency first aid, which may constitute ordinary negligence," (emphasis added). It can be argued that this language would not bar a bystander suit based on negligence. But this statute was passed long before Clohessy v. Bachelor, 237 Conn. 31 (1996), so the legislature would not have foreseen the need to use more expansive language to make sure bystander suits were barred especially in light of Maloney v.Cunningham, 208 Conn. 392 (1988).
In any event, this court, at least, concludes that to allow a bystander emotional distress claim under Clohessy, given the objectives sought to be accomplished by our Good Samaritan Law would not be a rational result.
The court has previously discussed the broad purposes of Good Samaritan statutes like ours and why, to accomplish those purposes, the limited immunity the statute provides was thought necessary by our legislature. It would defeat those purposes if, although the patient could not bring an action against an EMT for "ordinary negligence," which caused injury, the patient's relative could bring an action based on the same acts or failures to act by the EMT which caused Clohessy type bystander emotional distress. What possible general policy reason could justify such a result? In Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559,585 (1995), the court said, "Plainly, every statute has some boundaries and the question then arises whether, and when, it is appropriate to apply the statute as a matter of common law, beyond its designated boundaries. . . . We have previously used statutes as a useful source of policy for common law adjudication, particularly if there was a close relationship between the statutory and common law subject matters." InBohan v. Last, 236 Conn. 670, 680 (1996), the court also said, "On numerous occasions, we have reexamined and readjusted our common law principles to assure a proper and harmonious accommodation between judge made law and statutory law." In areas where the appellate courts have not spoken common law courts also have an obligation to apply the common law in a manner that is coherent and supportive of statutory purposes. Because of that for the reasons indicated, the court concludes that counts two and eight should be dismissed in light of the immunity granted under § 52-557b(b).
 2. Governmental Immunity
The defendants have also raised the defense of governmental immunity. The Town of Montville is said to be immune because it is a municipality.Gordon v. Bridgeport Housing Authority, 208 Conn. 161. It is also argued that the Mohegan Fire Company and the Montville Fire Company are so-called quasi-municipal corporations — they were created for the CT Page 13729 sole purpose of providing the town with fire and rescue assistance and the paid firemen of both companies are paid directly through the town, the remaining firemen are volunteers but are employed by the town and assigned to the fire companies.
For authority that the fire companies are quasi-municipal corporations, the defendants rely chiefly on language in the case ofAlarm Applications v. Simsbury Volunteer Fire Company, 179 Conn. 54i, 547 (1980): "The defendant fire district is a quasi-municipal corporation. See Larkin v. Bontatibus, 145 Conn. 570, 576 . . . (1958). . . . We assume, without deciding, that the fire company was validly created pursuant to the bylaws of the fire district. Because the fire company under the circumstances of this case serves a public function, it may for our purposes be characterized as a quasi-municipal corporation governed by the laws pertaining to municipal corporations." In AlarmApplications, the plaintiff private corporation sought a judgment determining whether the sale of fire prevention equipment by the defendant volunteer fire department company was ultra vires and unauthorized.
In Larkin v. Bontatibus, supra, a municipal district, Blackstone Associates, was formed within a town pursuant to a statute authorizing creation of such districts for "municipal purposes." Apparently, this district was formed to build roads, sidewalks and sewers. People opposed to the creation of the district claimed it was not authorized because it was composed of non-contiguous areas and brought an action for declaratory judgment. The court said at p. 576: "A district established under the provisions of (Chapter 35 of the General Statutes) is a quasi-municipal corporation. . . . It has the right to lay and collect taxes for the accomplishment of its objects and for improvements within the district. In effect, it is a body politic within the confines of a larger municipal corporation, the town. . . . As such, the limitations on its extent must be governed by the laws pertaining to municipal corporations."
McQuillan, Municipal Corporations, 1993 revised edition defines quasi-municipal corporations as follows: . . . "A corporation created or authorized by the legislature that is merely a public agency endowed with such of the attributes of a municipality as may be necessary in the performance of its limited objective . . . [it is] a public agency created or authorized by the legislature to aid the state in, or to take charge of, some public or state work, other than community government, for the general welfare," Vol. 1, § 2.13, p. 163.
All of this is very interesting, but it does not get directly to the issue at hand — are these fire companies quasi-municipal CT Page 13730 corporations and, if so, does that entitle them and their employees to the immunity provided to municipalities at common law and by statute.
The court could find no Connecticut appellate cases dealing with this precise issue — they define quasi-municipal corporations to resolve issues raised in other contexts. The Supreme Court repeatedly refers to McQuillan's Law of Municipal Corporations and this court will now quote from that treatise's statement of the law on this issue and refer to cases that it cites. Section 53.05, in Volume 18 at p. 188 et seq. is entitled, appropriately enough:
"Immunity of municipal corporations" and there it says:
 . . . "the general rule has been that the quasi-municipal corporations are not liable for torts unless so provided by statute.
 "In determining whether an entity is a governmental entity exempt from liability for tort claims, the courts must look to see whether (1) the entity is created directly by the state, so as to constitute a department or administrative arm of the government; or (2) whether the entity is administered by individuals who are controlled by public officials and responsible to such officials or the general public. The immunity from liability of quasi-public corporations is generally placed upon the ground of their involuntary and public character. They are usually treated as public or state agencies, and their duties are ordinarily wholly governmental. They exercise the greater part of their functions as agencies of the state merely and are created for purposes of public policy."
cf., World Productions v. Capitol Improvement Board, 514 N.E.2d 634, 637
(Ind.App., 1987); Parvu v. Harrison Township Fire Dept., 255 N.W.2d 655,657 (Ct. of App., Mich., 1977).
The supplement at p. 41 goes on to fine tune these remarks and says:
 "An entity seeking the benefit of sovereign immunity must be performing a service traditionally performed by the government. It must also be controlled by and directly answerable to one or more public officials, public entities, or the public itself. Entering into a joint venture with a municipality to accomplish CT Page 13731 certain governmental objectives is not sufficient by itself. There normally must be some statutory authorization before an otherwise private entity will be able to enjoy sovereign immunity."
Citing Stacy v. Truman Medical Center, 836 S.W.2d 911 (Mo., 1992).
Stacy v. Truman Medical Center, 836 S.W.2d 911 (Mo., Sup. Ct., 1992) is an interesting case. It involved a wrongful death action arising out of a terrible situation where patients were burned to death in a hospital fire. The defense of sovereign immunity was raised. The medical center was formed in the following way: the Kansas City General Hospital and Medical Center entered into a "Cooperation Agreement" (authorized by state statute) with the city, the board of trustees of the county public hospital and the county to construct and operate a new hospital, the Truman Medical Center (TMC). The county issued bonds for the project and the city was to reimburse the new entity for providing services to the indigent. TMC receives funds from the state, private organizations, its patients, foundations, the county and the city, id. p. 918.
The Stacy court set forth three requirements for entities claiming sovereign immunity and its reasoning would apply to an entity claiming to be a quasi-municipal corporation. "First, each entity must perform a service traditionally performed by the government." The court applying this standard said that "Obviously, TMC's provision of medical care to indigent residents meets this requirement," id. p. 919. The court on the same page went on to say that "the second, and probably the most critical, requirement of entities entitled to sovereign immunity is that they are controlled by and directly answerable to one or more public officials, public entities, or the public itself."
As to the second requirement, the court concluded TMC did not meet this requirement. The court noted that the city and county do not control the center and in fact gave up control of TMC to a private board of directors when the not-for-profit corporation was formed. The court concluded that: "We hold this is not the kind of accountability to public officials or to the general public required to support an application of sovereign immunity," id. p. 919.
The third requirement involves how the public entity is formed. The court did not address this issue since it concluded the second requirement had not been met.
The court must analyze the record presented to determine whether these fire companies can be considered quasi-municipal corporations entitled to immunity. CT Page 13732
As to the related issue of the immunity of the individual defendants in this case, the court is indebted to the observation of another judge:
 "Though municipal employees, unlike their municipal employers, were typically held liable for their tortious conduct at common law, an exception was developed in the early Twentieth Century for negligent acts or omissions in the performance of purely public governmental duties which require the exercise of judgment or discretion. The rationale for according such immunity is virtually identical to that which has long supported the general common-law doctrine of municipal immunity, to wit: that municipal officers vested with responsibility for conducting the affairs of local government on behalf of the public should not be second guessed or interfered with by the courts, and that they should be emboldened to exercise their discretion fully, wisely and courageously without fear that they will be held civilly liable for mere mistakes in the formulation or execution of public policy."
See Wadsworth v. Middletown, 94 Conm 435, 439 (1920); Gordon v.Bridgeport Housing Authority, 208 Conn. 161, 169, fn. 3 (1988).
What this reasoning means is that if the fire companies do not qualify for immunity, then neither do the defendants assigned to them although they are paid directly by the city or the volunteer firemen even though, for example, the city pays for workers compensation coverage.
Are these fire companies quasi-governmental municipal corporations qualifying for immunity? In certain respects, the record is inadequate or not fully developed for the court to decide this issue.
But before turning to the Stacy requirements, the following matters should be noted: the ambulance services of these fire companies are in some sense part of the companies, they apparently share the same facilities and personnel although one of the services is incorporated. The town does fund the fire services component of the companies but the ambulance services apparently raise their own funds through donations and charge patients for their services. The town provides workers compensation benefits for volunteer firemen in the ambulance service so in this sense the town makes a financial contribution to the ambulance service component of the companies. Also, firemen, whose salaries are paid by the town, are assigned to the ambulance services. Obviously, this CT Page 13733 represents a financial contribution to the operation of these services. But as the court reasoned in Stacy and this court concludes such financial contributions cannot be considered a critical factor. The predicate requirement must be met that the entities involved are performing a public function. Even more important is the issue of control — if there is no control by the town over the entity to which it gives funds, the entity or its staff should not be able to claim immunity.
The court will now discuss the requirements for immunity for quasi-governmental agencies referred to by the Michigan Supreme Court in the Stacy case.
As to the first requirement, it would seem that these fire companies and their ambulance services by their provision of emergency medical services to all citizens have to be said to be providing a public service traditionally performed by government. The fact that they rely in part on donations to provide the emergency service would indicate that the service is not capable of being supported by charges to patients so all economic classes are benefitted by the service.
As to the third requirement — who formed the fire companies — nothing in the bylaws or corporate papers indicates town involvement. A Mr. Hillsberg, who has been the finance director of the town since 1990, states in an affidavit that the companies were incorporated by the town but there is no basis given for these statements, they are conclusory, in part, apparently based on hearsay and not supported by any documentation. Nothing else has been offered to the court such as whether or not there are any state statutes regulating the creation of fire districts or fire companies either under state or municipal auspices.
What is more confusing on this issue, however, is Chapter 368d of the General Statutes entitled "Emergency Medical Services" and its possible relevance. Neither of the parties address this chapter. It apparently requires that ambulance services must be licensed and certified by the state. If certain state reporting requirements are not met, then the licenses can be revoked, § 19a-177, also see § 19a-180. The commissioner of public health apparently issues regulations regarding their operation, § 19a-179. Municipalities must set up a local emergency medical plan, § 19a-181b. The public health commissioner licenses EMTs and § 19a-195 requires that at least one EMT be assigned to all teams sent to assist patients. The bearing of all this on the municipal or state involvement in the establishment of ambulance services throughout the state is not clear. CT Page 13734
In any event, the Stacy court rightly emphasizes the second requirement as the most important on the issue of whether an entity, and, as this court concludes, its staff should be given immunity — are the entities controlled or answerable to one or more public officials?
Why is the issue of control so important — because it is central to the issue of governmental immunity for quasi-government entities and, therefore, their staff or workers. That is so because the whole doctrine is based on the notion that public entities acting through their agents who are "vested with the responsibility for conducting the affairs of local government on behalf of the public should not be second guessed or interfered with by the courts" and they should exercise their responsibilities "without fear that they will be held civilly liable for mere mistakes in the formation or execution of public policy."
Well, the formula does not work if the quasi-governmental or municipal corporation is not controlled by the municipality and operates completely independently of any municipal direction or reporting requirements. It is the integrity and independence of the municipalities that is being protected and supported by granting immunity to these quasi-governmental entities. If control by municipal authorities were not to be a necessary requirement for immunity, then a whole host of charitable organizations performing public service work or even doing tasks the local governments also perform would be entitled to governmental immunity.
In any event, this record seems to indicate that the town exercised little or no control over the fire companies let alone the ambulance services. An examination of the depositions submitted by the plaintiffs of the staff and directors of these services indicate they operated independently of the town government and regulated their own affairs. The ambulance services apparently had their own chain of command and the paid firemen assigned by the town to these services did not run them or supervise their operations. Nor was there any indication that these paid firemen assigned by the town received any instructions from the town as to how they should perform their jobs on a day-to-day basis or as to how the ambulance services should be run or what their role should be while working with the ambulance services.
Finally, the state licensing and regulatory procedures set forth in Chapter 368d of emergency medical services have no bearing on the control requirement since immunity can hardly be claimed on the basis that these ambulance services are arms of the state — several professions are closely regulated by the state and, of course, cannot make a claim of governmental immunity.
In any event, for the foregoing reasons, the court will not farther CT Page 13735 analyze the governmental immunity defense since it concludes that it is not applicable based on this record.
 3. Gross Negligence
The defendants also argue that all counts of gross negligence and grossly negligent supervision are legally insufficient and should be dismissed. It is said that our state "does not recognize common law causes of action based upon the degree of negligence termed "gross'." As said in Decker v. Roberts, 125 Conn. 151, 157 (1939) . . . "gross negligence has never been recognized in this state as a separate basis of liability in the law of torts," also see Dickerson v. Connecticut,98 Conn. 87, 89 (1922). Two Superior Court cases are cited Croteau v.American Medical Response of Connecticut, et al, CV97-02560935; andShaham v. Wheeler, 1997 Ct. Sup. 64 (#321879) which hold that our Good Samaritan Law does not create a statutory cause of action for gross negligence. The Shaham court cites Decker and Dickerson and the case ofKowal v. Hofher, 181 Conn. 355, 359, n. 3 (1980), where the court declined to address the gross negligence allegation and confined itself to allegations of wanton and reckless conduct. The Shaham court quotesFlorestal v. Govt. Employees Ins. Co., 236 Conn. 299, 311 (1996), to the effect that "the fundamental objective of statutory construction is to ascertain and give effect to the apparent intent of the legislature," but then declines to recognize an action in gross negligence on the basis of the proposition that "it is . . . a rule of statutory construction that statutes in derogation of the common law are to be strictly construed,"Copeland v. Warden, 225 Conn. 46, 53 (1993). The Shaham court then says it cannot allow an action in gross negligence and contrary to the plaintiffs' assertions "this interpretation of the statute will not deprive injured parties of all recourse — they can still assert a claim sounding in willful, wanton and reckless misconduct, a cause of action long recognized in this state." The court then granted the motion to strike the count alleging gross negligence.
This court cannot agree with that approach. The court agrees that as an abstract proposition there can be no action for "gross negligence" in this state. But the legislature in § 52-577b(b) has specifically stated that actions against EMTs will not be allowed if they cause injury as the result of "ordinary negligence" but: "The immunity provided in this subsection does not apply to acts or omissions constituting gross, willful or wanton negligence." The legislature must be taken to be aware of the common law at the time it enacts legislation and the legislature can certainly create statutory causes of action. A plain reading of the just quoted language is that the legislature wanted to bar actions against EMTs for ordinary negligence, but did not believe they should receive immunity for acts of gross negligence — in other words, the CT Page 13736 problem presented is how can the legislative intent be accomplished without the creation of a modification in the common law by allowing an action for gross negligence. If § 52-577b(b) is applicable, an action in "gross negligence" must be permitted. Any other result would render the use of the word "gross" by the legislature, referring to negligence, totally meaningless. The court has previously referred to Bohan v. Last,
supra, where the court said, "On numerous occasions we have reexamined and readjusted our common law principles to assure a proper and harmonious accommodation between judge made law and statutory law,"236 Conn. at p. 680; also see Williams Ford v. Hartford Courant Co., supra. In other words, although there is no action in general for "gross negligence," where § 52-577b(b) is applicable a claim in gross negligence should be allowed. That, the court believes, is what Judge Thompson was saying in Shomsky v. City of Shelton Police Dept., et al,
1997, WL 746380 (CV-97-00582155). There, the court held a delay in responding to an emergency call was not "first aid" under the statute so that the actions or failures to act of the EMTs did not come within the ambit of § 52-557b and the immunity it affords. As to the counts alleging gross negligence, the court did strike them since "gross negligence is not a cognizable cause of action." But as a predicate to that action, the court said, "However, since the court has held above that § 52-557b is inapplicable, insofar as the claims against (American Medical Response) are concerned, it cannot be relied upon by the plaintiff in an effort to salvage the gross negligence claims." In other words, if § 52-577b is applicable as it is here, the plaintiffs can make a claim in gross negligence. That is the only way to harmonize the common law of our state — which still in general does not recognize such a tort, but still accommodate what appears to be the obvious intent of the legislature.
The defendants could have argued, although they did not do so here, that the terms "gross, willful or wanton negligence" really represent the same conduct so that an action for wanton or willful or reckless misconduct is the only claim that can be made, i.e. it includes gross negligence.
And it should be noted that some courts take the view that gross negligence and willful, wanton and reckless conduct tend to merge and take on the same meaning. Falkowski v. Maurus, 637 So.2d 522, 525-526
(La.App., 1993);[2] Flynn v. U.S., 681 F. Sup. 1500 (D. Utah, 1988) (court interpreting Utah Good Samaritan Law). But these statutes only fail to give immunity for gross negligence so the courts were interpreting that phrase standing alone. Our legislature barred immunity for "gross, willful or wanton negligence" so presumably separate meanings must be given "for each of those terms. The Nebraska Supreme Court did so in a statute with similar language to our own ("nor shall immunity apply CT Page 13737 to any person causing damage or injury by his (sic) willful, wanton or grossly negligent act of commission or omission, § 71-5111 of Neb. stat.), see Wicker v. City of Ord, 447 N.W.2d 628, 633-636 (Neb., 1989), and a commentator notes that at least a minority of courts define and distinguish the various degrees of negligence, Prosser Keeton on theLaw of Torts, 5th ed., § 34, pp. 211-214.
In any event, the court is not prepared to resolve this unargued point on the state of this record. It is the court's opinion, therefore, that the gross negligence counts are not legally insufficient. Furthermore, the defendants only made a legal insufficiency argument as to these counts without positing the viability of a gross negligence claim and then arguing that there was no evidentiary basis for such a claim. The motion is denied insofar as it applies to the gross negligence counts.
 4. "Willful And/or Wanton Conduct" — "Willful And/or WantonNegligence"
On May 29, 1998, the plaintiffs filed an "amended complaint and/or substitute amended complaint (additionally and/or alternatively)." Basically, this document contains two separate sets of counts. Counts twenty-five through thirty-six make various claims against various defendants, but each characterize the activity on which they are based as "willful and/or wanton conduct."
Counts thirty-seven through forty-eight mirror the claims made in Counts twenty.-five through thirty-six, but characterize the same activity as "willful or wanton negligence."
Both sets of counts frame their allegations in the same way — as to each count they claim one or more of the defendants, in various ways, acted in "reckless disregard" of the rights of the plaintiffs. In this respect, the two sets of counts mirror each other except for their characterization of each count in their heading in the first set as "willful and/or wanton conduct" (Counts 25-36) and the heading of each count of the second set (Counts 37-48) as "willful and/or wanton negligence."
The only counts in each set of counts that differ from this pattern are the failure to properly supervise counts — count thirty-four in the first set and county forty-six in the second set. Each of these counts make the same allegations except for the fact that the heading of count thirty-four describes the claim as one of "willful and wanton conduct" and count forty-six describes the claim as one of "willful and/or wanton negligence." CT Page 13738
It should be noted that nowhere in these two sets of counts do the plaintiffs allege intent to do harm. As noted, despite the characterizations given to each set of counts, each count uses the language of reckless disregard.
The defendants have filed their summary judgment motion basically alleging that there is no basis for the assertion of willful or wanton conduct and no action lies in our state for willful or wanton negligence.
It is also true that under the Practice Book, the court has a separate obligation to review the pleadings so that the issues between the parties can be rationally defined. Practice Book § 10-1 states that: "If any pleading does not fully disclose the ground of claim or defense, the judicial authority may order a fuller and more particular statement; and if in the opinion of the judicial authority the pleadings do not sufficiently define the issues in dispute, it may direct the parties to prepare other issues, and such issues shall, if the parties differ, be settled by the judicial authority."
The court will first examine the legal sufficiency of each of the previously mentioned sets of counts keeping also Practice Book § 10-1
in mind. Assuming the legal sufficiency of either set of counts, the court will then examine the defendant's claim that there is no basis in the record to support claims of willful or wanton conduct.
 (a)
The best way to approach this issue of legal sufficiency is to take an overview of actions that may be brought against defendants like this (EMTs in light of § 52-557b(b) and the viability of alternative pleading in such a context.
It is true that parties can plead in the alternative, but they may not plead, under the guise of pleading in the alternative, the same legal theories in separate counts whose only difference is verbiage added to the headings but which make the same factual or legal allegations in the body of the counts.
The court concludes that in light of our Good Samaritan Statute (§52-557b(b)), there are three viable liability theories that can be advanced against EMTs who cause injury to patients. The statute only gives immunity for negligence therefore an action can be brought where there is an actual intent to commit harm. In light of the actual language of the statute, for reasons previously discussed, an action may be brought in gross negligence. The court also concludes that the statutory CT Page 13739 language permits an action for "willful or wanton negligence." Any other reading would mean that the language of the statute providing for immunity but saying such immunity does not apply to "willful or wanton negligence" is just exotic verbiage.
A problem is presented by this interpretation — how could there be such a thing as willful or wanton negligence — if activity is willful and/or wanton, is not such activity intentional which is abhorrent to the whole idea of negligence — what in fact is willful or wanton negligence?
 (i)
Can there be willful and/or wanton negligence? Isn't this an oxymoron? The problem is that the legislature uses these terms and they must be given a reasonable meaning, if possible, in order to effectuate the legislative purpose. cf. Bohan v. Last, supra; Williams Ford v. HartfordCourant Co., supra. Is it possible to define these words — willful and/or wanton negligence — so that they have an understandable meaning that can be interpreted by the court in order that a cognizable legislative purpose can be effectuated?
For one thing, Connecticut courts have defined the concept of "wanton misconduct" that for all intents and purposes can be called wanton negligence and when all is said and done is really recklessness. In Menziv. Kalmonowitz, 107 Conn. 197, 199 (1928), the court said in language that even helps address the distinction from "gross negligence":
 "Wanton misconduct is more than negligence, more than gross negligence. It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of action. "
See also Kowal v. Hoffner, 181 Conn. 355, 362 (1980).
In Dubay v. Irish, 207 Conn. 518, 532 (1988), the court references many cases and says:
 "`Recklessness is a state of consciousness with reference to the consequences of one's acts . . . It is more than negligence, more than gross negligence . . . The state of mind amounting to recklessness may be inferred from conduct. But in order to infer it there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid CT Page 13740 injury to them.' . . . `It is such conduct as indicates a reckless disregard of the just rights or safety of others or the consequences of the action. '" (Emphasis added by this court.)
In other words, our cases do recognize the concept of "wanton misconduct" — it is not indicative of an actual intent to do harm and is even more serious than "gross negligence." Further, the cases appear to identify the concept with recklessness.
What about willful negligence? No appellate court in our state has defined that term but courts in other states have dealt with these different degrees of negligence running from the ordinary variety through gross, willful and wanton conduct or negligence, see generally 57A Am.Jur.2d, "Negligence," §§ 257-304, pp. 293 through 323. It is true that some courts regard the terms "wanton negligence" and especially "willful negligence" as self contradictory," see § 286, p. 314 of Am.Jur. article, also see Tognazzini v. Freeman, 123 p. 540, 543 (Cal., 1912). But it is also true that other courts do use the term "willful negligence" distinguishing it from "gross negligence," see Broward v.Leffwich, 89 S.E.2d 32, 35 (Va., 1955), cf. Billingsley v. Westrac Co.,365 F.2d 619, 622 (CA. 8, 1960); Bowden v. Cary Fire Prot. Dist.,710 N.E.2d 548, 552 (Ill.App. 1999).
In Prosser Keeton, Law of Torts, 5th Ed., there is a discussion which indicates that courts do use the terms "wanton" and "willful" in discussing conduct that is not intended to do harm but represents an aggravated form of negligence. At § 34, pp. 212-214, Prosser says that there is an area of liability producing conduct that might best be defined as involving "quasi-intent." "To this area, the words `willful,' `wanton,' or `reckless' are customarily applied, and sometimes, in a single sentence, all three . . . the three terms have been treated as meaning the same thing, or at least coming out at the same legal exit. . . . They apply to conduct which is still, at essence, negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if it were so intended. . . . The usual meaning assigned to `willful,' `wanton,' or `reckless' according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of an unknown or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." If we look to Dubay v.Irish, supra, what all this sounds like and, in fact is, is recklessness with perhaps a different emphasis — willful negligence meaning intentional disregard of consequences as opposed to wanton negligence which would be a reckless disregard of the consequences. CT Page 13741
In other words, not only have courts used the terms willful and/or wanton conduct and/or negligence, but it is not unreasonable for them to do so or for courts to apply statutes that use those terms. This court believes the terms really define the full ambit of our concept of recklessness with, as indicated, a different nuance if the activity is characterized as wanton or willful but still not intentional. The best explanation of all this, the court has found, is set forth in an Am.Jur. observation at § 286, pp. 314-315 of 57 A. Am.Jur.2d, relying on Professor Herman appearing in 36 Univ. of Miami L.Rev. 379 (1982).
 "Observation: The apparent contradiction between the terms "willful' or "wanton' on the one hand, and "negligence' on the other, based on a distinction between negligence as causing harm through an inadvertent disregard of risk and intentionally causing harm, may be avoided by adopting a phenomenological analysis of negligence. This analysis defines negligence as a culpable misdirection of attention — an individual's semiconscious choice to ignore certain due concerns. Hence, when culpable inattentiveness continues over time, one may say that the individual is reckless, or even "willfully negligent' because the general disregard the proper object of concern involves a chosen orientation. Negligence and recklessness within this account can be viewed as existing on a continuum rather than as separate categories, and the term `willful negligence' loses its apparent contradictory quality."
The use of the fancy word "phenomenological" did not, at least, help the court understand the issues at hand but does support the notion that willful or wanton negligence are viable concepts especially within the general category of recklessness and the court should recognize such a legal claim for what it is — recklessness — at least in situations where § 52-557b(b) is applicable and intent to do harm is not claimed but recovery for injury by EMTs is sought because the injury was caused by an aggravated form of negligence.
The court concludes that since § 52-557b(b) is applicable, a cause of action for willful or wanton negligence is legally sufficient. The court further concludes that this result is necessary to accommodate the legislative purpose as explicitly expressed in the statute. Furthermore, the claims of willful negligence and wanton negligence can be brought in the same count since they merely represent different nuances of the concept of recklessness. CT Page 13742
The court further concludes that an examination of the complaint in this case makes clear that there is no claim of intent to do harm and nothing offered by the plaintiffs in response to the defendants' motion for summary judgment suggests otherwise. Therefore, counts twenty-five through thirty-six alleging willful and/or wanton conduct in their headings are duplicative of counts thirty-seven through forty-eight which are based on "willful and/or wanton negligence." Both sets of counts rely on claims of "reckless disregard" of Mrs. Hansen's rights — the last group of counts at least uses the statutory language in their respective headings. Having both sets of counts creates unnecessary confusion. Pursuant to the defendants' motion and the supervisory power over pleadings granted to the trial court counts twenty-five through thirty-six are dismissed.
The court will now address the question as to whether apart from the legal sufficiency of a claim against these defendants based on willful and/or wanton negligence (recklessness) there is an appropriate basis to conclude that the defendants' motion for summary judgment should be granted because there is no material issue of fact preventing such a result.
 (ii)
The defendants argued that there can be no claim for willful and/or wanton negligence and therefore that counts thirty-seven through forty-eight were legally insufficient. The defendants did, however, seem to accept the proposition that a claim in recklessness would lie, a claim which they assume was raised by counts twenty-five through thirty-six — the willful and/or wanton conduct counts. Counts twenty-five through thirty-six were dismissed only because they were duplicative of the willful and/or wanton negligence counts (thirty-seven through forty-eight) — each separate set of counts made claims in recklessness. And the defendants have presented argument going beyond mere legal sufficiency of the recklessness claim. They argue that on the state of the record before the court no claim in recklessness can lie. The plaintiffs have responded by numerous citations to the record. Therefore, the court believes it can and should address the substantive viability of counts thirty-seven through forty-eight based on the record before it and decide whether a disputed issue of material fact prevents the court from granting the defendants' motion for summary judgment. The defendants argue that since no such issue exists, the motion should be granted.
First, the defendants argue that "the plaintiffs have merely copied their factual allegations used to support their claim of negligence and CT Page 13743 substituted the term `reckless disregard' for `negligence.' As a matter of law, this is not enough to establish reckless conduct," page 36 of defendants' first brief. Camporrone v. Cooper, 1992 WL 219293 (Conn.Super. 1992), is cited which states "recitation of acts previously asserted to support a cause of action in negligence, without more, cannot be transformed into a claim for reckless misconduct by mere nomenclature". See also Brock v. Waldron, 127 Conn. 79, 81 (1940); Brownv. Bradford, 12 Conn. App. 106, 110 (1987).
That argument is good as far as it goes, but it cannot be used to avoid analysis — in other words, what if the allegations of the negligence count which are then repeated in the counts alleging recklessness can be read as establishing recklessness of which negligence is a subtype — certainly in such a situation the reckless counts would survive a claim of legal insufficiency. But rather than treat this motion as a motion to strike, the court will directly deal with the substantive issue raised by the motion for summary judgment. Based on the allegations in the complaint and the documents and affidavits presented on this motion can there be said to be a disputed issue of fact as to whether the willful and/or wanton negligence counts (i.e., the reckless disregard counts) should stand?
The defendants' argument comes down to this — even if the factual allegations made in the complaint as to reckless disregard are accepted as true and presumably supported by the opposition to this motion, all of this does "not raise even a suspicion of reckless disregard." The defendants cite the case of Shieman v. Lafayette Bank Trust Co.,4 Conn. App. 39 (1985), for the basic definition of recklessness. Recklessness "`requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger, to any reasonable (person),' and the actor must recognize that his (her) conduct involves a risk substantially greater . . . than that which is necessary to make his (her) conduct negligent. . . . It is `more than negligence, more than gross negligence,'" id. pp. 45-46. The Shieman case specifically refers to the Restatement (Second Torts), § 500, comment (g).
The actor must realize a high degree of danger is involved — more is involved than inexperience, excitement or confusion causing a mistake — more than mere inadvertence or thoughtless behavior is involved, id. p. 45. See cases cited by the court earlier in decision such as Dubayv. Irish, supra, and Prosser at § 34, where he says willful, wanton or reckless conduct involves a situation where an "actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow and which thus is usually accompanied by a CT Page 13744 conscious indifference to the consequences," p. 213.
The defendants also raise more specific arguments. They point to the fact that only one defendant, Mr. Morin actually moved the plaintiff by using her right arm — the eight other individual defendants thus had no personal involvement in causing the injury so summary judgment should be granted at least as to them. A second brief filed by the defendants also has attached to it a handbook of standard first aid where, the defendants allege, "a very similar transfer to the one used in this case is taught to students as a method of carrying patients to stretchers."
In opposing the defendants' position, the plaintiffs make numerous references to the record before the court on this motion to argue that the motion should not be granted because material issues of material fact are present which must be decided by a jury. The court will now paraphrase the factual references and then discuss case law definitions of recklessness and § 500 of the Restatement.
As a predicate to the following discussion, it should be noted that the call for emergency services was prompted by the fact that Mrs. Hansen injured her leg. When the EMTs arrived, they set her leg, but she apparently also complained about pain in her shoulder. The plaintiffs argue that the defendants acted with reckless disregard of Mrs. Hansen's rights because they "acted with conscious disregard for the safety of the plaintiff" Exhibit C at page 44 reflects the cross examination of one of the defendants, Mr. Morin. He is asked if he came upon a person injured in her shoulder area would one of the training courses he took indicate how the person was to be lifted. The response was in the affirmative. This defendant had previously said in lifting Mrs. Hansen a hand was put under her armpit — the courses this defendant, Mr. Morin, took did not authorize such a lifting procedure. The "proper way" to lift Mrs. Hansen would have been to use a backboard or go behind her back to lift her while also reaching under her legs. (pp. 44-45 of Morin transcript.) Mr. Morin also said at his deposition that he knew Mrs. Hansen had a knee injury and also said her shoulder hurt — he said he took that into consideration and was careful. The deposition of Mr. Zis (Exhibit D) is also referred to, but the reference is somewhat confusing. An instruction manual called "the Brady book" is referred to — the lengthy question by plaintiff's counsel describes a lifting procedure set forth in that book which indicates the EMTs would put their hands under both armpits of the patient. The witness said he did not recall if the procedure described by the lawyer is set forth in the Brady book. Zis also said he had no firm recollection as to how Mrs. Hansen was moved — there was a man at each side and one at her legs. Zis remembers she screamed just outside the door of the house as she was being carried. CT Page 13745
The plaintiffs rest their main argument on the fact that the defendants "picked her (Mrs. Hansen) up by grabbing the very area where she was injured: her shoulder. . . . It does not take an EMT to know that you should not pick up someone who they claim weighs over 250 pounds by grabbing their arms or armpits if they had an injured shoulder." (p. 78 of brief.) The deposition of Mark Waters, one of the defendant EMTs, is referred to at several places.
At the deposition of Mark Waters § Exhibit B), one of the defendant EMTs, plaintiffs counsel brought out that Waters knew Mrs. Hansen was complaining about pain in her shoulder. Mr. Waters was in charge of the transportation of the patient. He was asked whether he allowed Mrs. Hansen to be picked up by having two others pick her up by reaching under her armpit in that shoulder area. Mr. Waters responded by saying that he was worried about her legs, he lifted her legs while the other two EMTs took care of her shoulders. All the EMTs made a joint decision as how to lift Mrs. Hansen but Mr. Waters denied giving any directions as to how her upper body was to be lifted, but he did tell the EMTs who were to do this that she had pain in her shoulder.
Mr. Waters also said he acted properly in letting the other EMTs lift Mrs. Hansen, knowing she had severe shoulder pain, by putting their arms under her armpits. There was no other way to move her, he said, given her size and the small area she was located in when the EMTs arrived. Waters also said she did not have any life threatening injuries in response to a question as to whether there was anything about her condition required her to be moved quickly.
Aspects of the Waters deposition not referenced by plaintiffs include Waters' statement that he did not know what type of shoulder injury Mrs. Hansen had. His training did not allude to torn rotator cuffs but did include training as to dislocated shoulders. He also said that he centered his attention on her leg, he did not view the shoulder pain to be significant.
A second Waters deposition added that when Mrs. Hansen was first lifted she said, "Ow;" that occurred inside the house and Mrs. Waters did not know what she was referring to when she said "Ow." Outside the house she cried out in pain and the EMTs continued to put her on the stretcher at that point.
In their opposition to the motion on the reckless disregard claim, the plaintiffs also rely heavily on the affidavit of Charles Epstein. He is an EMT instructor, tests EMT candidates and has impressive credentials to support his expertise and knowledge of appropriate EMT procedure. CT Page 13746
He examined and measured the area where Mrs. Hansen fell. He placed in that location two different standard backboards and an extrication device which are "standard pieces of equipment required in ambulances in Connecticut." Epstein further went on to say that "the backboard would have been the standard of care for moving Mrs. Hansen out of her house as opposed to the way that they picked her up and carried her out, based on the mechanism of her fall." The extrication device allows someone to be lifted without using their upper extremities including the arm and shoulders. Review of the ambulance reports indicates that there was nothing that indicated it was necessary to remove Hansen immediately and not follow "the usual standard of care procedures" — even if this were not so the manner in which she was transported was "improper."
Epstein goes on to say that because of the way the defendant EMTs lifted Mrs. Hansen, "there was no way to keep her arms from moving in an upward manner. As they were lifting her, her arms went up and the EMT then jerked the arm, causing the injury she suffered to her rotator cuff." The method of lifting used was not approved or taught in the local, state or National Department of Transportation course. Epstein goes on to say if the proper procedure had been used her shoulder would not have been injured. The defendants "concluded" Hansen had injured her shoulder when she fell, yet they did nothing to immobilize her arm and under no circumstances such as this should the arm, shoulder or elbow be used to transport a patient by lifting.
Furthermore, when Mrs. Hansen screamed, they should have put her down immediately and resurveyed the situation. Mr. Epstein embellishes his observations with statements to the effect that given this conduct, the defendants acted with reckless disregard of Hansen's rights; given their training and experience, they had to be conscious of the fact that hat their conduct would cause injury or further injury. Indeed, given her screaming out and her complaint that her arm was being hurt, their continuing to carry Hansen out showed "a design, purpose and intent to do wrong or inflict injury."
Mrs. Hansen's affidavit, although not directly referred to by the plaintiffs, states that due to the way she was transported there was no way her arms would not move up and she suffered her rotator cuff injury when an EMT grabbed her arm. She said she screamed in pain but in her affidavit, it does not indicate she told the EMTs where the pain was. She also stated "911" was called due to the injury to her leg received in the fall. In her deposition Mrs. Hansen said as she was being carried out, she started to slip and yelled that the EMTs were dropping her — one of the EMTs took her arm then and pulled her up. When he did this — jerking her arm up to stop her from falling she said she CT Page 13747 screamed, "Oh my, what have you done to my. . . ." When the arm was pulled up, she "heard like a clunked sound."
Exhibit T submitted by the plaintiffs is interesting, although it was not referred to by either side on the recklessness issue. In it, there are contained two letters from plaintiff's counsel to Mrs. Hansen's treating doctor, Dr. Richeimer. In them, the lawyer asks for various opinions and describes what he claims is the mechanism of how she was carried by the EMTs and how she may have been injured. The letter of February 16, 1996 states:
 When the EMTs came, they lifted her by picking her up under her armpits. At one point in time, she started to feel as if she was going to hit the ground and she commented about that fact and she was pulled up by her armpits, causing a clunk sound, popping sound, in her right shoulder. She was in excruciating pain from that point on.
 We would like to know if it would be your opinion that the lifting or a jerking of the armpit dislocated the arm at the shoulder and whether you think that is what occurred in this case, based upon this information. Obviously, we are asking this in the realm of reasonable medical certainty based upon the facts as recounted by Ivy Hansen.
The letter of May 22, 1996, said the following as to how the injury may have occurred:
 Mrs. Hansen was being carried out by two persons lifting under her armpits and one lifting her legs. As she was going out of the house, the person who was carrying her on her right side jerked her arm upward causing her arm to be out and up. (Mrs. Hansen has indicated that she complained just prior to her shoulder being jerked that she felt as if she was falling or slipping.) She experienced intense pain at that point in her shoulder. She complained of it and cried out.
 Based upon the above, we would like for you to provide us an opinion as to whether the movement of Mrs. Hansen by the persons moving her and the motion of her arm, as described, would cause the dislocation of her right shoulder that she currently has. CT Page 13748
The doctor responded on July 12, 1996, as follows:
 Based on the information provided, it is my medical opinion that the movement of Mrs. Hansen by the persons moving her and the motion of her arm as described did cause the dislocation of the right shoulder — she will need to have the rotator cuff surgically repaired.
The doctor also said in his opinion the shoulder was not dislocated by Mrs. Hansen's initial fall which led to the "911" call.
Based on the foregoing, is there a material issue of material fact which prevents the granting of summary judgment on the counts alleging "willful and/or wanton negligence"?
Regarding a claim in negligence, it has been pointed out in Horton and Knox, Connecticut Practice Vol. 1A, p. 49, "there is still some reluctance to grant summary judgment in negligence cases" citing Fogartyv. Rashaw, 193 Conn. 442, 444 (1994), but on the other hand, "granting meritorious summary judgments should be an integral part of the court's gate keeping function." And query, whether this "reluctance" should have the same weight when the complaint sounds in the much stricter claim of recklessness? True, on such a motion the evidence must be viewed in the light most favorable to the non-moving party. Connell v. Connell,214 Conn. 242 (1990), but the test is really whether the moving party, on the same evidence, would be entitled to a directed verdict. Charlemagnev. Progressive Northwestern Ins. Co., 63 Conn. App. 596, 600 (2001).
In fact, in several jurisdictions with Good Samaritan Laws, courts have granted summary judgment motions in favor of EMT defendants and reversed judgments-against such defendants on the basis that as a matter of law aggravated forms of negligence could not be found given the record presented on the pretrial motions or to juries, see Malcolm v. City ofEast Detroit, 468 N.W.2d 479, 486, 487 (Mich., 1991); Wicker v. City ofOrd, 447 N.W.2d 628, 633-635 (Neb., 1989); Tatum v. Gigliotti,565 A.2d 354, 358 (Md., 1989); Flynn v. U.S., 681 F. Sup. 1500, 1508
(D. Utah, 1988); Ambrose v. New Orleans Police Amb. Service, 639 So.2d 216,223 (La., 1994): Bowden v. Cary Fire Protection Dist., 710 N.E.2d 548,552, 554 (Ill.App., 1999), cf. Youngblood v. Schireman, 765 P.2d 1312,1318-1320 (Wash.App., 1988).
Turning to the facts of this case, the difficulty with the plaintiffs' position is reflected in the dichotomy of the evidence offered by the plaintiffs to sustain their allegation of willful and/or wanton CT Page 13749 negligence, i.e. reckless disregard. On the one hand, deposition testimony is offered from the EMTs to the effect that they knew the plaintiff was complaining of shoulder injury yet they engaged in a lifting procedure that required two of them to place their hands and/or arms under her armpits or shoulder — one of which was the injured shoulder. Also, they continued to carry her in an inappropriate manner after she yelled "Ow" in pain. The plaintiffs' expert, an eminently qualified person, states unequivocally that the method used to carry the lady violated the standard of care — she could have been put on a backboard which would have fitted into the space where she was located. There was no need to manually lift her merely because the stretcher would not fit into the hall area where Mrs. Hansen fell.
The problem with relying on this evidence to support the claim of reckless disregard is that it ignores the mechanism of injury to Mrs. Hansen's rotator cuff. What the court means by this requires a closer examination of the concept of recklessness. As the Shieman case indicates, recklessness "requires a conscious choice of a course of action either with knowledge of the serious dancer to others involved in it or with knowledge of facts which would disclose this danger. . . ."4 Conn. App. at pp. 45-46 (emphasis added). Section 500 of the Restatement (Second) Torts is titled, interestingly enough, "Reckless Disregard of Safety Defined." Comment a at page 588 says: "It must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence." (Emphasis added.)
In other words, one of the factors that goes into deciding whether conduct is reckless or shows a reckless disregard of the safety of others is some notion that the conduct in question involves the risk of very serious injury to another — disregarding such a risk is what makes such conduct wanton. As Dubay says, "Recklessness is a state of consciousness with reference to the consequences of one's acts,"207 Conn. at p. 532. When the consequences could entail the possibility of serious injury or death to another, then we have a reckless or wanton state of consciousness — that is what makes the conduct wanton.
There is nothing in this record to indicate that these defendants, even if negligent in the manner in which they lifted her by placing their arms under her armpit and shoulder, had any realization or consciousness that they were thereby causing her or running the risk that they were causing her serious physical injury nor can it be said by any of the evidence presented that they were aware of facts that would alert a reasonable person to those possibilities of serious injury.
This must be so since again there is nothing to indicate the mode of CT Page 13750 lifting just mentioned while causing her pain had anything to do in and of itself with causing the rotator cuff injury. That is, Mrs. Hansen did not get a rotator cuff tear because someone put his hands or arm under her right shoulder which they knew or should have known was injured in a fall which itself did not cause the rotator cuff tear.
The mechanism of the latter injury is revealed in the correspondence between the plaintiffs' counsel and their expert, Dr. Richeimer. The woman began to slip while being transported and apparently to prevent this there was a "lifting or jerking of the armpit" — "as she was going out of the house the person who was carrying her on her right side jerked her arm upward causing her arm to be up and out." It was based on this information that Dr. Richeimer concluded Mrs. Hansen's right shoulder was dislocated "by the persons moving her and the motion of her arm as described." (i.e., in plaintiffs counsel's letter). The plaintiff's EMT expert Epstein recognizes this mechanism of injury in his report, Exhibit U, where he states: "As they [the EMT defendants] were lifting her, her arms went up and the EMT then jerked the arm causing the injury she suffered to her rotator cuff."
In other words, these defendants may have been negligent in the way they carried her because they knew or should have known it might or could cause her pain.
But how can it be said that all these defendants knew and consciously disregarded the risk that the method they used to carry Mrs. Hansen would cause her to begin to slip before they could get her to a stretcher or could otherwise safely lower her to the ground and superimposed on this possibility was another unpredictable possibility that once she started to slip, one of the defendants would spontaneously grab her upraised arm to prevent her from slipping further, all of which would have created a situation where that defendant and all defendants together could be said to have consciously disregarded a risk that this lady would suffer a rotator cuff tear? To pose the too lengthy question necessarily provides a negative answer. For recklessness, the risk of serious injury presented by the possibility of occurrence of these factual scenarios had to be apparent and consciously disregarded at the point the defendants decided to carry her the way they did. That cannot be said given the nature of the factual occurrences. The court concludes the willful and/or wanton negligence counts, sounding in recklessness (Counts thirty-seven through forty-eight) should be dismissed.
 5. Bystander Emotional Distress
Apart from the foregoing discussion of the viability of the various theories of liability presented by the plaintiffs, the court concludes CT Page 13751 that even if it had decided all such theories were viable no claim for bystander emotional distress by Hansen should lie and will discuss this issue separately.
Under various theories of liability and in several counts, the plaintiff husband makes a claim for bystander emotional distress and appended to such claims are demands for indemnification.
The defendants have advanced several reasons why they believe that claim and the counts which arise from it should be dismissed. It is argued that Mr. Hansen did not witness the injury producing the event, that Mrs. Hansen did not of course die nor were her injuries substantial and that Mr. Hansen's alleged distress is neither severe nor debilitating. It is also argued that bystander emotional distress cannot arise from a medical malpractice injury. As to the latter argument, this court has already decided that in an appropriate case an action for bystander emotional distress as a result of medical malpractice would be permitted in our state after Clohessy v. Bachelor, 237 Conn. 31 (1996); see Davis v. Yale New Haven Hospital, 26 Conn. L. Rptr. 481 (2000). Also see Bond v. Kalla, 21 Conn. L. Rptr. 682 (1998) (Koletsky, J.) As noted in Davis, there really is no common sense reason why our Supreme Court, having adopted the California approach on this tort by accepting theDillon/Thing analysis would apply that analysis in a more restrictive manner than several other jurisdictions which permit the tort in malpractice cases and also follow Dillon/Thing. In fact, California itself permits an action for bystander emotional distress in the malpractice context. Ochoa v. Superior Court, 703 P.2d 1 (Cal., 1985). Apart from that consideration does Clohessy permit a bystander claim in this case? Let us review the Clohessy requirements. Clohessy adopted a reasonable foreseeability rule permitting an action for bystander emotional distress subject to these conditions:
 (1) The bystander must be closely related to the injury victim.
 (2) The bystander's emotional injury must be caused by the contemporaneous sensory perception of the event or conduct that causes the injury.
 (3) The injury to the victim must be substantial, resulting either in death or serious physical injury.
 (4) The bystander must have sustained a serious emotional injury — that is, a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the CT Page 13752 circumstance.
237 Conn. pp. 52-54.
The court will focus on the third Clohessy requirement — the victim's injury must result in death or serious physical injury. NeitherDillon v. Legg, 441 P.2d 912 (1968) nor the case modifying it, Thing v.LaChusa, 771 P.2d 814 (1989), explicitly mentioned this third factor but "most courts require that the victim suffer critical injury or death before the plaintiff can bring a bystander action. See Lejeune v. RayneBranch Hospital, 556 So.2d 559, 570 (1990); Heldreth v. Marrs,425 S.E.2d 157, 164 (W.Va., 1992) (critical injury or death required);Portee v. Jaffee, 417 A.2d 521, 527-528 (N.J., 1980); also see James v.Lieb, 375 N.W.2d 109, 116 (Neb., 1985). Clohessy cites Lejeune andPorter as the basis for the serious injury requirement and the court concluded that this limitation on the tort was necessary because "it is essential that the liability for bystander emotional distress be circumscribed," 237 Conn. page 54. Thus, the Lejeune court said at 556 So.2d, page 570, "the direct Victim of the traumatic injury must suffer such harm that it can reasonably be expected that one in the plaintiff's position would suffer serious mental anguish from the experience." In other words, it is fair to apply a reasonable foreseeability test against defendants when their negligence causes death or serious physical injury since in those circumstances it should be expected that severe emotional distress would be caused.
A slightly different nuance and important consideration on the issue of whether the tort should be recognized in a particular case is the concern as to whether the claimant has really suffered severe emotional injury — how can we the courts be sure of this sometimes elusive factor. Again, the Porter case, much referred to in Clohessy, underlines why serious injury observed by the claimant is so important. The New Jersey Supreme Court said: "No loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure." The law should find more than pity for the one who is stricken by seeingthat a loved one has been critically inured or killed," 417 A.2d at page 526 (emphasis added by this court). But a necessary predicate to such an observation "is that recovery should be limited to those situations which threaten the plaintiff's basic emotional security. Since the sense of loss attendant to death or serious injury is typically not present following lesser accidental harm, perception of less serious harm does not usually result in severe emotional distress," "Emotional Distress of Bystander," 6 COA 695, 716, § 10 (Victim's Death or Serious Injury) (1985). As the court said in Gates v. Richardson, 719 P.2d 193, 199
(Wyo., 1986): "As an assurance of genuine shock, the courts that have CT Page 13753 adopted the tort have generally agreed that the person claiming emotional harm must witness a serious accident or its aftermath. The primary victim must, in fact, be seriously injured or killed and the claimant must realize, at the time he (sic) witnesses the event, that the injuries are serious. . . . We base this limitation on the common sense notion that people recover from serious shock quickly if it turns out to be a false alarm." And as the court said in Frame v. Kothari, 560 A.2d 675 (1989).
 "To justify recovery, the plaintiff should observe the kind of result that is associated with the aftermath of an accident, such as bleeding, traumatic injury and cries of pain. Gates v. Richardson, 719 P.2d 193, 199
(Wyo., 1986). Recovery for the negligent infliction of emotional distress is meant to cover the observation of shocking events that do not occur in the daily lives of most people." Id. page 678.
Although not exactly on point, the case of Justus v. Atchison,565 P.2d 122 (Cal.Sup.Ct., 1977), makes some interesting observations. There, two fathers made bystander emotional distress claims for the death of their unborn children. The Supreme Court upheld the dismissal of theirDillon claims and said the following at pp. 135-136.
. . . "each complaint paints the following picture: the plaintiff husband witnessed certain disturbing developments in the delivery room, including expressions of concern by the medical staff and use of emergency procedures. Whether the described events constitute negligence is questionable, but they no doubt induced a growing sense of anxiety on the plaintiff's part. Yet his anxiety did not ripen into the disabling shock which resulted from the death of the fetus until he was actually informed of that event by the doctor; prior to that moment, as a passive spectator he had no way of knowing that the fetus had died. In short, the impact derived not from what he saw and heard during the attempted delivery, but from what he was told after the fact. As we have seen, however, a shock caused by "learning of the accident from others after its occurrence" (68 Ca.2d at p. 741, 69 Cal.Rptr. at p. 80, 441 P.2d at p. 920) will not support a cause of action under Dillon."
Keeping the foregoing observations in mind, what are the facts here and how do they measure up to the third Clohessy requirement that the injury to the victim must be substantial resulting, if not in death, in serious CT Page 13754 physical injury? The court will accept the plaintiff's characterization and summary of the relevant facts to oppose this aspect of the motion for summary judgment, see pp. 95-96 of brief. The plaintiff describes how his wife was lifted, how he observed one of the defendants put his arm under her armpit, "how he heard his wife scream loudly in pain . . . and how he saw his wife's body move in an upward direction suddenly approximately six to eight inches. Clearly, all of these incidents comprise a "sensory perception' of the actual event that injured Mrs. Hansen." Mr. Hansen did not see his wife "jerked" but he was in a position "to perceive the fact that she was injured suddenly during the carrying process." The court could not locate Mr. Hansen's deposition as an exhibit, but as indicated, accepts the plaintiff's characterization of his deposition testimony as it appears in the brief of the plaintiff.
If we stop the analysis at this point, even if we were to add a fact Mr. Hansen did not see — his wife being "jerked" as she slipped — how can it be said that at the time Hansen made his observations he was observing serious, physical injury to his wife? Given these facts, how could it possibly be said these defendants should be held to have reasonably foreseen the type of emotional harm that permits recovery in these types of cases? From Mr. Hansen's perspective, how can it be said that at the point of his observations the law should step in because the man was "stricken by seeing that a loved one has been critically injured"? (See quote from Porter, supra.) To ask the questions is to provide the negative answers.
Perhaps in recognition of these difficulties, the plaintiff Hansen then seeks to import into his opposition to the defendants' motion facts and conditions pertaining to his wife that would have become apparent or made known to him only at a time later than the time at which he actually observed his wife being carried into the ambulance. The plaintiff points out that as a result of the defendants' actions Mrs. Hansen "suffered a severe rotator cuff tear of her right shoulder," she was in a nursing home for over a month and separated from her husband of many years. Mrs. Hansen required extensive surgery and the rehabilitation of her knee, that was injured in the fall that prompted the call for emergency assistance, "was hindered due to the injury to her shoulder," which she blames on the defendants.
The court will accept for the purposes of discussion that a tear of the rotator cuff is a serious injury. But further assuming a causal connection between the resulting injury and the actions of the defendants, which the court does for the purposes of this motion, there is no indication that the husband was aware at the time of observing his wife being lifted that he knew or had reason to know that because of the way she was being carried or because she screamed out loudly in pain or CT Page 13755 because he saw his wife's body move in an upward direction that he had a "sensory perception" of such an injury that would require surgery and extensive therapy, let alone any knowledge that the lady's rotator cuff was injured. All of this is underlined by examining plaintiff's Exhibit T.
Plaintiff's Exhibit T, which includes requests for opinions from the plaintiff's expert and a responsive letter from that expert, Dr. Richeimer, indicates that on May 22, 1996, some seven months after the incident, plaintiff's counsel was asking causation questions — would the way Mrs. Hansen was moved have caused her shoulder to be dislocated — based on her activity before being carried by the defendants, was it more likely than not that the shoulder was dislocated by the initial fall as opposed to how Mrs. Hansen was carried by the defendants? Dr. Richeimer responded some two months later. And although he apparently told plaintiff's counsel before May 22nd of the rotator cuff injury, he did not put into writing Mrs. Hansen's need for surgery until July, 1996 when he responded to the attorney.
The date this information was requested and the nature of the information requested only underline the fact that Mr. Hansen at the time of the observations not only did not observe Clohessy type serious injury, but could not have appreciated the significance of any injury.
The problem presented by this factual scenario is based on the fact that the second and third requirement of Clohessy must be read together. As the previous discussion has shown there must be a contemporaneous sensory perception (second requirement) of death or serious physical injury (third requirement) and the party claiming bystander injury must be aware of the nature of the injury at the time of the sensory perception. As noted, the Clohessy court when discussing the third requirement — death or serious physical injury — indicated as much when it quoted from Lejeune v. Rayne Branch Hospital, supra. to the effect that "the direct victim of the traumatic injury must suffer such harm that it can reasonably be expected that one in the plaintiff's position (bystander relative) would suffer serious mental anguish from the experience," Clohessy at 237 Conn. pp. 53-54. The court went on to say, "To a sensitive parent, witnessing a minor injury to his or her child could produce an emotional response," but "under those circumstances a cause of action for bystander emotional distress will not lie," "When confronted with accidental death (or serious injury," the reaction to be expected of normal persons . . . is shock and front," id. p. 54. (Emphasis added by this court.)
To paraphrase the previous quote from Justus v. Atchinson, supra, discussing the anxiety suffered by a plaintiff learning of death or CT Page 13756 serious physical injury: "The impact derived not from what (Mr. Hansen) saw and heard during the defendants' carrying of Mrs. Hansen), but from what he was told (or learned) after the fact," id. 565 P.2d at p. 135-136. In other words, the emotional shock, compensation for which is the linchpin of Thing and Clohessy, did not foresecably accrue to Mr. Hansen at the time he saw his wife carried and suffer some injury to an extent not knowable to him. Any emotional impact resulted from the fact that at some point after the allegedly injury producing actions of the defendants, Mrs. Hansen (1) may have had or had trouble moving her shoulder and arm; (2) was told or may have been told or realized her shoulder was dislocated; (3) was told or may have been told she suffered a tear of her rotator cuff and needed surgery; (5) in fact had surgery; (5) required physical therapy and was away from her husband.
This cannot be an appropriate basis for a bystander claim or the floodgates that Clohessy was so interested in circumscribing by setting up its requirements for this tort would certainly be open.
All bystander counts should be dismissed because the requirements ofClohessy have not been met.
 Conclusion
The effect of the court's ruling is as follows:
(1) The following negligence claims and claims derivative of them are dismissed: Counts one, two, three, seven, eight and nine. Counsel in this regard should examine footnote 1.
The court will not dismiss counts lying in negligent supervision or counts derivative of such a claim except for those based on bystander emotional distress. The motion has not been directed to those counts and the bearing of our Good Samaritan Law on such a claim has not been addressed by the parties.
(2) The court dismisses all claims under any theory based on bystander emotional distress. Here, the court dismisses the counts involving such a theory which were not dismissed on some other basis; those counts are six, twelve, fourteen, eighteen, twenty and twenty-four.
(3) The court dismisses all counts based on "willful and/or wanton conduct;" therefore, counts twenty-five through thirty-six are dismissed.
(4) The court dismisses all counts sounding in willful and/or wanton negligence; these counts are numbered thirty-seven through forty-eight. CT Page 13757
Corradino, J.